

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1482-07 through PD-1489-07

### STEPHEN RUFFIN, Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE TENTH COURT OF APPEALS
### CORYELL COUNTY

**COCHRAN, J., delivered the opinion of the unanimous Court.**

### OPINION

Appellant was charged with first-degree aggravated assault by shooting at ten police officers during an armed "standoff" on his rural property in Coryell County. He contended that he was suffering from severe delusions and believed that he was shooting at Muslims, not police officers. He intended to shoot, but not at a public servant. The trial judge excluded testimony by appellant's psychologist about the existence and severity of his mental disease and delusions, ruling that such expert testimony is admissible only when the

defendant is accused of homicide or pleads insanity. Appellant was convicted and sentenced to ten years' imprisonment on each of nine charges.[1] The court of appeals affirmed the convictions and held that the trial judge did not abuse his discretion in excluding the expert testimony.[2] We granted appellant's petition for discretionary review.[3] We reaffirm our decision in *Jackson v. State*[4] and hold that both lay and expert testimony of a mental disease or defect that directly rebuts the particular *mens rea* necessary for the charged offense is relevant and admissible unless excluded under a specific evidentiary rule.

## I.

Late in the evening of April 14, 2005, one of appellant's neighbors called the Coryell Sheriff's Department to report gunshots from appellant's property. Deputy Carol Brown immediately headed for appellant's property. She had known appellant and his family for more than ten years and had once worked at his skating rink as a security guard. A month earlier, appellant's wife, Lavon, had told Carol that appellant's mental health was

---

[1] The State dismissed the charges concerning a tenth officer before trial because the officer could not be located.

[2] *Ruffin v. State*, 234 S.W.3d 224, 227 (Tex. App.–Waco 2007) ("because Ruffin was not being prosecuted for homicide and was not pursuing an insanity defense, the court did not abuse its discretion by sustaining the State's objection to Dr. Carter's testimony.").

[3] Appellant's question for review is as follows:
Did the court of appeals err in holding appellant was barred from introducing mental impairment evidence that showed he was only guilty of a lesser-included offense because it believed this Court intended to limit such evidence to murder cases in its decision in *Jackson v. State*?

[4] 160 S.W.3d 568 (Tex. Crim. App. 2005).

deteriorating.  Deputy Brown had informed the sheriff's office of appellant's condition, so that evening two officers were dispatched to investigate the gunshots.

Deputy Paniagua arrived shortly after Deputy Brown, and they drove their patrol cars up the dirt driveway, through the woods, toward appellant's home.  They parked and started to approach the house, with Deputy Brown calling out "Steve," so he would know that his friend Carol was there.  She did not say that they were police officers.  Two dogs ran up to them, one was bloody and looked like it had been shot.   They heard gunshots from inside[5] and, shortly thereafter, they heard appellant yelling from the woods, "Get the hell out of here!"  A few seconds later, they heard more shooting, so they ran back to Carol's patrol car, took cover behind the car door, and radioed for assistance.  The wounded dog leapt into the patrol car and wouldn't get out.  He kept stepping on the brake pedal, which turned on the brake lights and illuminated the officers hiding behind the patrol car door.

Deputy Brown continued to call out to appellant that "Carol" was here to check on his safety.  Appellant yelled back, "Carol, is that you?"  When she said "Yes," appellant shouted, "Carol, get the hell out of here before you get hurt."  Deputy Paniagua got his AR-15 from his trunk, and the two officers waited for backup.  Appellant kept yelling.  He repeatedly shouted, "I'm declaring marshal [martial?] law.  Carol, get out of here."

More officers arrived, and more shooting came from the wooded areas around

---

[5] When the police finally entered appellant's home, they discovered that he had shot his guitar, a chair, and the walls of his home.  They found that a third dog had died from gunshot wounds. They also found marijuana and marijuana pipes, four rifles, five handguns, and a considerable amount of ammunition.

appellant's house.  At one point, appellant yelled to Carol that he was "jacking off." Deputy Brown thought this was unusual because appellant did not talk that way.  He sounded bizarre and irrational.   Another time he said that he would not be "coming out" unless there was a "bullet in his head."  Throughout the night, appellant sporadically shot at the officers, but injured no one.[6]  The officers, exhibiting restraint, never shot back.  A DPS helicopter with heat-sensing equipment was dispatched, but appellant apparently shot at it, and the helicopter retreated.  At dawn, SWAT officers and a police negotiation team arrived from Waco.

David Turner, appellant's best friend and closest neighbor, drove to the scene and offered to help, but the deputies yelled at him to leave.  Mr. Turner told the deputies, "This is not Steve, you know, he doesn't do things like this."[7]

Around 11:00 a.m., the officers set up a special phone number for appellant's house. A hostage negotiator used a bullhorn to ask appellant to pick up his phone, saying that "Scott" wanted to talk to him.  Appellant did so.  He thought he was talking to a doctor, and, when "Scott" told him to come outside, he followed those instructions.  Appellant appeared

---

[6] Appellant shot out Deputy Brown's right front tire and, at some point, a bullet hit the side of her patrol car.

[7] Mr. Turner told the jury that appellant was, at that time, having mental problems.  He explained that appellant called him a few days before the standoff and asked him what his favorite color was.  When Mr. Turner said, "Blue," appellant sharply replied, "No, it's orange." He went down to talk to appellant because he was in one of his "spells," but when Mr. Turner walked in the door, appellant held a dagger-like object to his chest and asked him again what his favorite color was.  When he again said blue, appellant poked him with the dagger, so Mr. Turner grabbed it.  Appellant pulled the dagger back and it cut Mr. Turner's fingers.  Mr. Turner left, thinking that appellant had "lost his rocker" and "was in his own world."  Appellant sounded like he was living in the past, said he had a castle in Scotland, and was heir to the throne.

"startled" when he saw the police and patrol cars outside.  He was taken into custody.

Several lay witnesses testified for the defense concerning appellant's mental status. His wife, Lavon, had worked as a lieutenant in the prison system for ten years.  She said that appellant's moods worsened in the year before the standoff. He became obsessed with the color orange and thought that everything should be orange.  He burned all of the pictures in his house that his mother had painted because they contained colors other than orange.  He talked to the television set and thought that it talked back.  He would pull his cigarette lighter out and say, "Okay, Johnny, I know you're listening to me," and stick it back in his shirt pocket.  He took all of the appliances out of the house because they were bugged, and he wore a T-shirt with aluminum foil on it to protect himself from receiving signals from the tower.  Lavon finally moved out of their home in March.  When she talked to appellant the day before the standoff and he admitted that he needed to see a doctor, she agreed to come back home and help.

Appellant's mother, Reva Ruffin, testified that appellant had been taking Ritalin for the past year after his nephew was diagnosed with ADD and appellant thought that he, too, might be helped by that drug.  Ms. Ruffin said that appellant loved Ritalin and thought it was a miracle drug that allowed him to read "like never before."  A week before the standoff, she took him to see a psychiatrist, but appellant "fired" the doctor after talking to him for five minutes.

Appellant's nephew, Scotty, testified that, about two months before the standoff,

appellant came to visit him in Austin and said that he was going to give Scotty a thousand orange helicopters when he received his kingdom. Scotty was scared because appellant was acting so bizarrely.

Appellant testified that he first realized that something was very wrong when, about a month before the standoff, he was in Gatesville and "the whole town was like a hippy town. It all had psychedelic colors throughout the whole—every building was a different color and just multicolored buildings." He started seeing everything in psychedelic colors. People on TV were communicating with him and ridiculing him. He explained that he had two different voices in his brain, like two towers broadcasting. "One was girls, female, the other one was boys, male. The girls were Christian, the boys were Muslim." They liked each other, but they hated appellant. On the day before the standoff, he stopped at the Sheriff's Department and asked for a badge because he was supreme commander of the whole world.

Appellant testified that, on the night of April 14th, he heard a noise from his garage, located about 90 yards from his house, so he went down to investigate. He heard the voices of the boys and girls and "they were laughing at me and I thought it was real people that was stealing my stuff." He heard Carol when she first drove up, but didn't recognize her voice. He thought it was a trespasser, but when she hollered out that it was Carol, he told her that he didn't want to talk to her; "[G]o away, you're trespassing." He didn't see her uniform and didn't know she was acting in her official capacity as a police officer. "To me, she was just Lavon's friend." He said that he shot down at the ground so that she would go away. Then

he "fell back to another position" down the dirt road "and I thought the Muslims was hunting me, so I was out there hiding in the bushes." He was shooting Muslims; there were hundreds of Muslims. He moved around a lot in the woods because it was dangerous to stay in one place. "I also do remember at one time I heard people in my house, around the back of my house, and it was Muslims. I fired several rounds on each side of the door. They were waiting to kill me with a knife." Eventually he went to sleep in the house. A doctor called him. He went out the back door, saw police cars outside, and thought he was hallucinating.

Appellant's attorney also made a proffer of the testimony of a psychologist, Dr. William Lee Carter, who said that, in his professional opinion, appellant had fallen into a deep depression in the months before the standoff and had become psychotic. He began to suffer from delusions, paranoid thinking, and irrationality. Dr. Carter had twice seen appellant in the county jail after the standoff, and then saw him three more times in his office. Dr. Carter explained that a person who is delusional typically believes that his delusions are true. And a person who is experiencing paranoia has

> beliefs that people are out to get him, a lot of suspiciousness, considerable mistrust. If that's the case, and I believe that it was with [appellant], then when people say or do things to him, he interprets what they say and do according to his irrational or paranoid thinking, so his response to them is going to be based on his own irrationality as opposed to the other person's more rational state of being.

Dr. Carter also thought that, on April 14th, appellant was suffering from psychotic symptoms such as hearing or seeing things that did not exist. However, he did not think that appellant suffered from schizophrenia because that disease is ongoing whereas appellant had, while

he was segregated in jail, pulled himself together and returned to more normal function.  Dr.

Carter did not think that appellant was legally insane on April 14th, but that he was both

delusional and paranoid and "was not fully aware of the effects his behavior was having on

other people."  He had a "diminished capacity" to make rational judgments.

After this proffer, the trial judge excluded Dr. Carter's testimony because

> [t]he insanity defense is what is indicated and dictated as our way of determining the capacity of the defendant to make a specific mens rea.  The procedure for doing that is through the insanity defense.
>     I think in essence what Doctor Carter's testimony is, is geared toward [appellant's] ability or capacity to make that determination on the night in question.  As such, I think it is in effect an insanity defense.  I am going to disallow his testimony for those purposes.  I do find that under Rule 403 it would be more confusing to the jury because they would tend to interpret it as an insanity defense which has not been raised.  And without notice, the State, of course, does not have any experts available to testify on that subject.

Dr. Carter did testify during the sentencing stage.

On appeal, appellant claimed that the trial court abused its discretion in excluding Dr.

Carter's testimony that, because of mental illness and delusions, appellant did not know that

he was shooting at law-enforcement officers.  He argued that Dr. Carter's testimony would

support his theory that he was guilty only of the lesser-included offense of second-degree

aggravated assault.[8]  The court of appeals stated that appellant offered Dr. Carter's testimony

---

[8] The trial judge, based on appellant's testimony and that of the lay witnesses, instructed the jury on the lesser-included offense.  He also instructed the jury that "[t]he defendant is presumed to have known the person assaulted was a public servant if he was wearing a distinctive uniform or badge indicating his or her employment as a public servant."

under *Jackson v. State*,[9] not to establish an insanity defense, but to negate the *mens rea*

element of knowing that the persons he was shooting at were police officers. However, it

noted that in *Jackson* we quoted Article 38.36(a)[10]–a statute that applies exclusively to

murder trials–after stating,

> As with other elements of the offense, relevant evidence may be presented which the jury may consider to negate the *mens rea* element. And, this evidence may sometimes include evidence of a defendant's history of mental illness.[11]

Thus, the court of appeals concluded that evidence of a mental illness or defect that negates

the *mens rea* of an offense is admissible only in a murder trial.[12]

## II.

Texas law, like that of all American jurisdictions, presumes that a criminal defendant

is sane and that he intends the natural consequences of his acts.[13] Texas law, like that of

---

[9] 160 S.W.3d 568 (Tex. Crim. App. 2005).

[10] TEX. CODE CRIM. PROC. art. 38.36(a) ("In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.").

[11] 160 S.W.3d at 574.

[12] *Ruffin*, 234 S.W.3d at 227.

[13] *Martinez v. State*, 867 S.W.2d 30, 33 (Tex. Crim. App. 1993) ("There is a general presumption of sanity and the defendant bears the burden of proving, by a preponderance of the evidence, his insanity at the time of the conduct charged."); *Manning v. State*, 730 S.W.2d 744, 746 (Tex. Crim. App. 1987) ("From earliest times, this Court has held that the general rule in Texas is that 'where insanity is set up in the trial of a case to avoid punishment for an act charged to be criminal, the presumption is that he [the defendant] is sane, and the burden of proof is on

many American jurisdictions, excuses a defendant from criminal responsibility if he proves,

by a preponderance of the evidence, the affirmative defense of insanity.[14]  This defense

excuses the person from criminal responsibility even though the State has proven every

element of the offense, including the *mens rea*, beyond a reasonable doubt.[15]  The test for

determining insanity is whether, at the time of the conduct charged, the defendant–as a result

him to show by preponderance of evidence that he is insane.'"); *Ex parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005) ("It is both a common-sense inference and an appellate presumption that a person intends the natural consequences of his acts, and that the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill.") (internal citation omitted); *see Leland v. Oregon*, 343 U.S. 790, 799 (1952) ("In all English-speaking courts, the accused is obliged to introduce proof if he would overcome the presumption of sanity.").

[14]  TEX. PENAL CODE § 8.01(a) ("It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.").

[15] Commentators have frequently noted that "persons crazy enough to be legally insane are not necessarily lacking *mens rea*. Even defendants who are most demonstrably legally insane rarely lack the *mens rea* for the highest charged offense." Stephen J. Morse, *Undiminished Confusion in Diminished Capacity*, 75 J. CRIM. L. & CRIMINOLOGY 1, 18 (1984).  Or, as another commentator has explained,

> There is no necessary connection between a judgment about the defendant's criminal responsibility and his mental capacity to entertain the state of mind required by the crime. As long as the *mens rea* element is defined in terms of the conscious mind, cognitive and affective functions, it is perfectly plausible that the defendant entertained the specific mental state but was still insane. In fact, most mentally abnormal offenders are fully capable of thinking about their criminal act before they do it, turning it over in their minds, planning the act, and then performing it in accordance with their preconceived plan. Evidence of how [a defendant's] mental abnormality impaired his behavior controls or made it difficult for him to appreciate the act's gravity does not negate the existence of the required mental states; it merely explains them.

Peter Arenella, *The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage*, 77 COLUM. L. REV. 827, 834 (1977).

of a severe mental disease or defect–did not know that his conduct was "wrong."[16]  Under

Texas law, "wrong" in this context means "illegal."[17]  Thus, the question for deciding

insanity is this: Does the defendant factually know that society considers this conduct against

the law, even though the defendant, due to his mental disease or defect, may think that the

conduct is morally justified?[18]

Insanity is the only "diminished responsibility" or "diminished capacity" defense to

criminal responsibility in Texas.[19]  These "diminished" mental-state defenses, if allowed,

---

[16] TEX. PENAL CODE § 8.01(a).

[17] In *Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994), we explained,
> Several expert witnesses testified appellant knew his conduct was illegal, however, these experts contended that appellant did not know the act was "morally" wrong.  In other words, appellant believed that regardless of society's views about this illegal act and his understanding it was illegal, under his "moral" code it was permissible.  This focus upon appellant's morality is misplaced.  The question of insanity should focus on whether a defendant understood the nature and quality of his action and whether it was an act he ought to do.  By accepting and acknowledging his action was "illegal" by societal standards, he understood that others believed his conduct was "wrong."

[18] *See id.*; *see also Reyna v. State*, 116 S.W.3d 362, 368 (Tex. App.–El Paso 2003, no pet.) (citing *Bigby* as the appropriate standard and holding that Reyna was not able to appreciate the wrongfulness of his actions).  Other Texas cases have applied a similar analysis, examining the evidence to determine if the defendants' behavior–such as concealing incriminating evidence, attempting to avoid detection or arrest, or avoiding leaving fingerprints–indicated that they knew their conduct was illegal.  *See, e.g.*, *Dashield v. State*, 110 S.W.3d 111, 115 (Tex. App.–Houston [1st Dist.] 2003, pet. ref'd) (concluding that defendant could determine right from wrong); *Love v. State*, 909 S.W.2d 930, 943 (Tex. App.–El Paso 1995, pet. ref'd) (finding that defendant's mental condition did not preclude him from distinguishing right from wrong); *Plough v. State*, 725 S.W.2d 494, 500 (Tex. App.–Corpus Christi 1987, no pet.) (holding that defendant was not so mentally ill that he was not able to know his conduct was wrong).

[19] *Jackson*, 160 S.W.3d at 573 (noting that the lower court had "correctly stated that Texas does not recognize diminished capacity as an affirmative defense, *i.e.*, a lesser form of the defense of insanity").

would permit exoneration or mitigation of an offense because of a person's supposed psychiatric compulsion or an inability to engage in normal reflection or moral judgment.[20] Such defenses refer to a person's lesser or impaired mental ability (compared to the average person) to reason through the consequences of his actions because of a mental disorder.[21] The Texas Legislature has not enacted any affirmative defenses, other than insanity, based

---

[20] *See, e.g.*, *United States v. Pohlot,* 827 F.2d 889, 890 (3d Cir. 1987) (explaining those concepts and noting that Congress precluded the assertion of a "diminished responsibility" or "diminished capacity" defense in its 1984 Insanity Defense Reform Act).

[21] *See id.* at 898.  The court in *Pohlot* quoted the House Judiciary Committee's discussion of the distinction between the "diminished capacity" defense and the use of evidence of a mental disorder to negate *mens rea.*

> The use of mental disorder to negate mental state elements of crimes should not be confused with the "diminished capacity" defense as developed by the California courts during the 1960's and 1970's.  Under that doctrine, a defendant could escape responsibility for a crime by demonstrating not that he or she lacked a required specific intent, but rather that his or her capability of entertaining that intent was not, because of mental disorder, commensurate with that of nondisordered persons.

*Id.* (quoting H.R. Rep. No. 98-577, 98th Cong. 1st Sess. 15 n.24 (1983)).  The court in *Pohlot* quoted that same House Report as arguing for the constitutionality of its post-*Hinckley* amendments to the federal insanity defense because the defense could be required to prove an affirmative defense once the State had proven all of the essential elements, including *mens rea*, beyond a reasonable doubt:

> By distinguishing the affirmative defense of insanity from the narrow mens rea/mental state requirements, the Committee's approach meets the constitutional requirement that the prosecutor prove all elements beyond a reasonable doubt while placing on the defendant the burden of demonstrating a reason for exculpation that presumes the existence of these elements.

*Id.* at 903 (quoting House Report at 14).  That House Report and the hearings concerning it assumed that the defendant would be permitted to offer psychiatric evidence to rebut the government's proof of a specific *mens rea* under its proposed insanity statute, a statute similar to that in Texas.

on mental disease, defect, or abnormality.[22] Thus, they do not exist in Texas.

But both physical and mental diseases or defects may affect a person's perception of the world just as much as they may affect his rational understanding of his conduct or his capacity to make moral judgments. For example, suppose that a blind person is sitting on his front porch and hears what he thinks is a trespasser coming up his walk. He shoots at the person to scare him away, knowing that it is illegal to shoot at people, even trespassers. The "trespasser" turns out to be a uniformed police officer who is coming to serve a subpoena. The blind man may be prosecuted for aggravated assault with a deadly weapon, but he cannot be convicted of aggravated assault of a police officer if, because of his blindness, he did not see the uniform and did not know that the person was a police officer. Evidence of the defendant's blindness would, of course, be relevant and admissible to rebut the State's assertion that the defendant intended to shoot at a police officer. Such evidence might be elicited from the defendant, a lay witness–mother, brother, friend, or neighbor–or from an expert, an optometrist, physician, etc. Courts routinely admit evidence of a physical abnormality offered to prove a lack of *mens rea*.

---

[22] A "diminished responsibility" defense appears to be common in European countries and "'permits the jury to mitigate the punishment of a mentally disabled but sane offender in any case where the jury believes that the defendant is less culpable than his normal counterpart who commits the same criminal act.'" *Pohlot,* 827 F.2d at 904 (quoting Peter Arenella, *The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage*, 77 COLUM. L. REV. 827, 829 (1977)). *See also Penry v. State*, 903 S.W.2d 715, 768 (Tex. Crim. App. 1995) (Maloney, J., concurring) (distinguishing "diminished capacity" as an affirmative defense from evidence that rebuts *mens rea* and further distinguishing "diminished capacity" from "diminished responsibility"; noting that "[m]ost of the state and federal courts recognize that evidence of diminished capacity is admissible to negate mental state").

In Texas, the same rule applies to evidence of a mental disease or defect offered to rebut or disprove the defendant's culpable *mens rea*.[23] If, instead of blindness, the defendant suffers from mental delusions[24] such that he sees a "trespasser" or a "Muslim" when everyone else around him sees a police officer, he cannot be convicted of intentionally shooting at a police officer, although he may be convicted of intentionally shooting at a trespasser or Muslim.  Guilt of the greater offense requires that the State prove, beyond a reasonable doubt, that the defendant intended to shoot a police officer,[25] not a trespasser or Muslim.  That is the required *mens rea* and that is the State's constitutional burden of proof.[26]

The defendant's right to present a defense generally includes the due-process right to

---

[23] *Jackson*, 160 S.W.3d at 574 ("As with the other elements of the offense, relevant evidence may be presented which the jury may consider to negate the *mens rea* element.").

[24] Professors Perkins and Boyce use the following definition of a "delusion" in the context of the criminal law and insanity:

> A delusion–always the product of mental disorder–is a false belief in something that would be incredible to people of the same class, age, education, and race, as the person who expresses it; such belief being persisted in, despite proof to the contrary.

ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 964 (1988) (quoting GLUEK, MENTAL DISORDER AND THE CRIMINAL LAW 183 (1925)).  The American Psychiatric Association defines "delusions" as "erroneous beliefs that usually involve a misinterpretation of perceptions or experiences."  THE AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 299 (4th ed. text rev. 2000).

[25] *See* TEX. PENAL CODE § 22.02(b)(2)(B) (aggravated assault is a second-degree felony, except that it is a felony of the first degree if it is committed "against a person the actor knows is a public servant while the public servant is lawfully discharging an official duty").

[26] *In re Winship*, 397 U.S. 358, 363-64 (1970). *See* PAUL H. ROBINSON, CRIMINAL LAW DEFENSES § 64(a), at 276 (1984) ("as long as a given state of mind is required by the offense definition, any evidence suggesting the absence of that required state of mind would necessarily be relevant and admissible, absent special restrictions, to determine whether all the required elements of the offense were satisfied.").

the admission of competent, reliable, exculpatory evidence to rebut any of those elements. Indeed, the Supreme Court has repeatedly struck down "arbitrary rules that prevent whole categories of defense witnesses from testifying."[27] Quite recently, however, the Supreme Court upheld Arizona's wholesale exclusion of expert psychiatric testimony concerning mental illness offered to rebut proof of the defendant's *mens rea*.[28]

---

[27] *See Rock v. Arkansas*, 483 U.S. 44 (1987) (striking down a state rule that prevented the defendant from testifying because she had previously been hypnotized and questioned about the issues); *Crane v. Kentucky*, 476 U.S. 683, 687(1986) (reversing conviction because of state judicial rule excluding evidence of the circumstances surrounding the defendant's confession); *Chambers v. Mississippi*, 410 U.S. 284, 299-302 (1973) (ordering new trial because of, *inter alia*, state evidentiary rule excluding adverse witness's out-of-court confession); *Washington v. Texas*, 388 U.S. 14, 22 (1967) (striking down Texas statute prohibiting testimony of defendant's alleged accomplice).

[28] *Clark v. Arizona*, 548 U.S. 735, 779 (2006). In *Clark*, the Supreme Court addressed whether Arizona's judicially crafted state rule excluding evidence of a defendant's mental disorder short of insanity to negate the *mens rea* element of a crime violated federal due process. *Id.* at 742. Clark was charged with the intentional murder of a police officer. His defensive theories were that he was legally insane at the time of the killing and that he was operating under the paranoid delusion that "aliens" were "trying to kill him, and bullets were the only way to stop them." *Id.* at 745. The trial court allowed the defendant to offer a wealth of lay "observational" testimony concerning his mental illness and delusions and admitted extensive psychiatric evidence bearing on the affirmative defense of insanity. After hearing all of the evidence, the trial court rejected the insanity defense and found the defendant guilty of the intentional murder. The state appellate court found that the trial court could, under Arizona law, exclude Clark's evidence of mental illness to rebut the requisite criminal intent, and the Supreme Court affirmed that holding.

The Supreme Court indicated that lay and expert "observational" testimony was both relevant and admissible "to show what in fact was on Clark's mind when he fired the gun." *Id.* at 757. Nonetheless, the Court stated that Arizona courts could, consistent with the due-process clause, exclude "mental-disease" evidence offered for purposes of rebutting *mens rea* because of (1) the controversial character of some categories of mental disease; (2) the potential of mental-disease evidence to mislead; and (3) the danger of according greater certainty to "capacity" evidence than experts claim for it. *Id.* at 774-78. Thus, states that decline to admit such expert mental-disease evidence to rebut *mens rea* do not violate the due-process clause. *Id.* at 779. Conversely, no state is required to exclude such evidence.

This Court, however, had already held that such expert evidence might be relevant, reliable, and admissible to rebut proof of the defendant's *mens rea*.[29]  We, like the dissenting justices in *Clark*,[30] have confidence that our Texas judges and juries are sufficiently sophisticated to evaluate expert mental-disease testimony in the context of rebutting *mens rea* just as they are in evaluating an insanity or mental-retardation claim.   Of course, such evidence may, in a particular case, be excluded under other evidentiary rules, such as Rules 403 or 703-705, if the probative value of the proffered evidence is substantially outweighed by the danger of unfair prejudice, if the expert is insufficiently qualified, or the testimony is insufficiently relevant or reliable under our state's guidelines for expert testimony.[31]  Such

---

[29] *Jackson v. State*, 160 S.W.3d 568 (Tex. Crim. App. 2005).

[30] *See Clark*, 548 U.S. at 792-96 (Kennedy, J., joined by Stevens and Ginsburg, JJ., dissenting).  Justice Breyer noted that a *per se* ban upon expert mental-disease testimony to rebut *mens rea* unduly restricts, if not prevents, the jury from making the factual determination of whether the defendant was "unaware that he was shooting a police officer." *Id.* at 791.  He noted that states already have the discretion to bar "unreliable or speculative testimony and to adopt rules to ensure the reliability of expert testimony." *Id.* at 792.  He stated that the risk of jury confusion did not justify the rule because Rule 403 provides a mechanism to exclude specific expert testimony that is unfairly complex.  "The difficulty of resolving a factual issue, though, does not present a sufficient reason to take evidence away from the jury even when it is crucial for the defense.  'We have always trusted juries to sort through complex facts in various areas of the law.'" *Id.* at 793.  And the fact that such evidence might be unduly complex and confusing in some cases does not justify an across-the-board ban. *Id.* at 793-95.

[31] *See Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998) (overruled on other grounds); *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).  For example, in *Hart v. State*, 173 S.W.3d 131, 141-42 (Tex. App.–Texarkana 2005, no pet.), the court of appeals held that the trial court did not err in excluding defendant's expert testimony that, in her opinion, the defendant was acting under the influence of an alternate identity at the time of the offense and therefore could not have voluntarily or knowingly committed the offense, because he made no claim that he committed the offense while unconscious or in a semi-conscious condition.

evidence may also be excluded if it does not truly negate the required *mens rea*.[32]

III.

In this case, the court of appeals applied a blanket ban against the admission of expert testimony offered to rebut appellant's *mens rea* at the time that he shot at the police officers. It stated that such evidence was inadmissible "because [appellant] was not being prosecuted for homicide and was not pursuing an insanity defense[.]"[33] The court of appeals misunderstood our decision in *Jackson*, and the State agrees that it did so.[34] We did not limit our holding or reasoning in *Jackson* to murder prosecutions or to any specific *mens rea* element. We repeat and reaffirm our holding in *Jackson* that "relevant evidence may be presented which the jury may consider to negate the *mens rea* element. And this evidence

---

[32] *See, e.g., United States v. Brown*, 326 F.3d 1143, 1148 (10th Cir. 2003) (trial court properly excluded expert psychiatric testimony that, because of post-traumatic-stress syndrome and chemical dependency, defendant was unable to make "correct choices"; testimony did not rebut *mens rea* in prosecution for conspiracy to possess methamphetamine); *United States v. Cameron*, 907 F.2d 1051, 1067-68 (11th Cir. 1990) (stating, "Evidence offered as 'psychiatric evidence to negate specific intent' is admissible . . . when such evidence focuses on the defendant's specific state of mind at the time of the charged offense," but holding that defendant failed to demonstrate how her expert's generalized psychiatric testimony would negate intent in drug-trafficking prosecution); *United States v. White*, 766 F.2d 22, 24-25 (1st Cir. 1985) (upholding exclusion of expert psychiatric testimony "to the effect that, because of the influence exerted upon her by her mother, she was unable to resist her mother's request for assistance, and was thus compelled to aid her in her drug dealing" as merely evidence of a "diminished capacity" to control his conduct).

[33] *Ruffin*, 234 S.W.3d at 227.

[34] State's Brief at 41 ("The Court of Appeals was incorrect in reading *Jackson* to state that the diminished capacity defense applies in Texas but only in cases involving murder").

may sometimes include evidence of a defendant's history of mental illness."[35] We quoted article 38.36 in *Jackson* for the unremarkable proposition that both the State and defendant may offer testimony as to "all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense."[36] This is one of the few Texas statutes that explicitly states the obvious: evidence offered by either the defense or prosecution is relevant (and presumptively admissible) to prove or disprove the pertinent *mens rea* at the time of the offense.

The testimony proffered by Dr. Carter in this case is clearly relevant to the issue of whether appellant intended to shoot at police officers during the standoff or whether, because of a mental disease and the delusions that he suffered as a result of that disease, he believed that he was shooting at Muslims or some other figment of his mind. Although the trial judge permitted numerous lay witnesses, including appellant himself, to testify to "observational evidence" concerning appellant's mental breakdown and delusions, that evidence was never put into a mental-disease context or its psychological significance explained. But expert evidence that would explain appellant's mental disease and when and how paranoid delusions may distort a person's auditory and visual perceptions is admissible as it relates to whether appellant intended to shoot at police officers, unless that evidence is otherwise

---

[35] *Jackson*, 160 S.W.3d at 574.

[36] Tex. Code Crim. Proc. art. 38.36.

barred by evidentiary rules.[37]

The State argues that the trial court also excluded Dr. Carter's testimony under Rule 403, finding that it would confuse the jury whose members might interpret it as relating to an insanity defense which was never raised. The State did not rely upon Rule 403 in the court of appeals, but because reviewing courts will uphold a trial court's ruling if it is correct on any applicable legal theory,[38] we agree that the court of appeals should have the opportunity *ab initio* to review the trial court's Rule 403 ruling and, if appropriate, to assess any harm in excluding Dr. Carter's testimony.

We therefore reverse the judgment of the court of appeals and remand the case to that court for further proceedings consistent with this opinion.

Delivered: December 10, 2008

Publish

---

[37] *Jackson*, 160 S.W.3d at 574.

[38] *See Sauceda v. State*, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004) ("If the ruling was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made, then we must uphold the judgment.").