Opinion filed February 9,
2012

 

 

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-10-00057-CR 

                                                    __________

 

                                  WILLIAM
JOSEPH MARSHALL

                A/K/A
WILLIAM MARSHALL FREEMAN, Appellant

 

                                                             V.

 

                                      STATE
OF TEXAS, Appellee



 

                                   On
Appeal from the 350th District Court

                                                            Taylor
County, Texas

                                                    Trial
Court Cause No. 9072-D 

 



 

                                            M
E M O R A N D U M   O P I N I O N

            The
jury convicted William Joseph Marshall a/k/a William Marshall Freeman[1]
of aggravated assault with a deadly weapon and assessed his punishment at
confinement for eleven years.  We affirm.

The
Charged Offenses

            The
indictment contained two counts.  Count One alleged that, on or about March 4,
2009, appellant committed the offense of aggravated assault in that he “did
then and there intentionally and knowingly use and exhibit a deadly weapon,
to-wit: A HANDGUN, and the said [appellant] did then and there intentionally
and knowingly threaten PATRICK DELL HALE with imminent bodily injury by the use
of said deadly weapon.”  Count Two alleged that, on or about March 4, 2009,
appellant committed the offense of deadly conduct in that he “did then and
there knowingly discharge a firearm at and in the direction of [Hale].”  The
jury convicted appellant of the aggravated assault offense charged in Count
One.

Points
of Error on Appeal

            Appellant
presents two points of error for review.  In his first point, appellant
contends that the trial court erred by excluding the expert testimony of a
neuropsychologist concerning appellant’s mental state and capacity.  In his
second point, appellant contends that the trial court erred by excluding evidence
of a prior consistent statement made by him.

The
Evidence at Trial

            Although
appellant does not challenge the sufficiency of the evidence to support his
conviction, we will summarize the evidence to provide context for the issues on
appeal.  The record shows that Patrick Dell Hale lived at 1043 South 12th
Street in Abilene, Texas.  Hale testified that, on March 4, 2009, at about 6:30
p.m., he and his cousin, Justin Scott Fenwick, were standing in his front
yard.  Hale said that nobody else was with them.  Hale’s house was located at
the corner of South 12th Street and Sycamore Street.  Hale’s red Ford Explorer
was parked in the street in front of the house facing east toward Chestnut
Street.  Fenwick’s Ford Mustang was parked in the lot next to Hale’s house.

Hale
testified that he saw appellant driving a gold Chevrolet Cavalier north on Sycamore
Street toward South 11th Street.  Hale said that appellant and Wesley Freeman
(Freeman) were brothers.  Freeman and Hale had had problems with each other in
the past.  Hale said that, before the date of the incident, he had seen
appellant with Freeman.  Hale knew appellant by the name, “Bubba.”  Appellant’s
girlfriend, Hannah Guinan, was in the car with appellant.

Hale
testified that appellant stopped the car on Sycamore Street between South 12th
Street and South 11th Street.  Appellant then got out of the car, popped the
trunk, and got a black case from the trunk.  Hale testified that appellant got
back into the car and made a right turn onto South 11th Street.  Hale next saw
appellant as he turned onto South 12th Street from Chestnut Street.  As
appellant approached Hale’s house, Hale saw appellant holding a gun.  Hale told
Fenwick that appellant had a gun.  Fenwick ran and hid behind his Mustang. 
Hale saw appellant cock the gun.  Hale said that appellant started shooting the
gun when he got beside Hale’s Explorer.  Hale ducked behind his Explorer.  He
said that he would have been shot in the face if he had not ducked.  Hale said
that appellant fired five shots and shot out windows of the Explorer.  Hale
could hear the gun firing and the windows breaking.  Hale said that he threw a
brick at appellant’s car after appellant fired the five shots.  According to
Hale, appellant turned left onto Sycamore Street and then fired four more
shots.  Hale said that one bullet hit the ground near his foot.  He believed
that some of the bullets hit his neighbor’s house.  Appellant drove away from
the scene.  Fenwick called Hale’s sister to let her know what had happened, and
Hale’s sister called the police.  Hale said that he and Fenwick did nothing to
provoke appellant into shooting at them.  Hale also said that neither he nor
Fenwick shot a gun.

Fenwick
also testified.  In most respects, his testimony was similar to Hale’s
testimony.  Fenwick testified that he and Hale were talking with each other as
they stood on the sidewalk in front of Hale’s house.  Fenwick said that he saw
a man driving a tan or gold Chevrolet Cavalier on Sycamore Street toward South
11th Street.  Fenwick said that there was a female passenger in the car.  Fenwick
did not know appellant and had never seen him before the incident.  During his
testimony, Fenwick identified appellant as the man who was driving the car.  Fenwick
testified that appellant stopped the car and grabbed a black box from the trunk.
 Appellant turned from Chestnut Street onto South 12th Street.  Hale said that appellant
had a gun, and Fenwick saw appellant cock the gun right before he got to Hale’s
neighbor’s house.  Fenwick ran to his car and hid behind it.  Appellant started
shooting the gun.  Fenwick said that he heard five shots. Fenwick said that
appellant turned from South 12th Street onto Sycamore Street.  As appellant was
turning, Fenwick heard four more shots.  Fenwick said that he did not shoot at
appellant’s car, that neither he nor Hale had a weapon, and that neither he nor
Hale did anything to provoke appellant into shooting at them.

Abilene
Police Officer Jeff Farley testified that, on March 4, 2009, at about 6:30
p.m., he heard seven gunshots while he was loading gear into his police car at
the law enforcement center. He said that the noise from the shots came from
south of the law enforcement center.  Soon thereafter, police dispatch made a
call that shots had been fired in the 1200 block of Sycamore Street.  Officer
Farley drove to the scene.  When he arrived, Hale and Fenwick were standing in
front of the house at 1043 South 12th Street.  They were looking at a red Ford
Explorer that was parked in front of the house.  Officer Farley testified that
the back window of the Explorer was shattered and that the passenger’s side rear
window was damaged.  Hale and Fenwick told Officer Farley that a man nicknamed
either “Little Will” or “Bubba” had driven by the house, shot at them, and left
the scene.  Officer Farley later determined that “Little Will” or “Bubba” was
appellant.  Hale and Fenwick also told Officer Farley that the neighbor’s house
may have been hit by a bullet.  Officer Farley testified that he saw a bullet
hole in the northwest corner of the neighbor’s house.  Officer Farley also
testified that he and Abilene Police Officer Christopher Heard found and
collected four bullet casings in the street near the rear of the Explorer. 
Officer Farley also collected bullet fragments that Hale found in the
floorboard of the driver’s side of the Explorer.

            Abilene
Police Officer Shad Phillips testified that, on March 16, 2009, he responded to
a call that there had been an armed subject at a skate park.  Officer Phillips talked
with Chris Delacruz, the alleged victim in the incident.  Delacruz told Officer
Phillips that he and appellant got into an argument with each other at the
skate park and that appellant retrieved a handgun from the trunk of a tan
sedan.  Delacruz told Officer Phillips that he fled the scene in his vehicle
after seeing appellant with the gun.  Officer Phillips went to the skate park
to look for the tan sedan.  He saw a car matching that description with license
plate no. KNW-166.  The car was unoccupied.  The evidence showed that this car
was Guinan’s Chevrolet Cavalier that appellant was driving during the March 4,
2009 incident.  Officer Phillips testified that he saw two males and two
females get into the car.  Officer Phillips made contact with the occupants in
the car.  Appellant and Guinan were two of the occupants.  Officer Phillips
testified that Guinan gave him consent to search the trunk of the car.  Under
the wheel well cover, Officer Phillips found a black handgun pouch containing a
.9 millimeter, semiautomatic handgun.

Officer
Phillips asked Guinan about the handgun.  Guinan told Officer Phillips that she
did not know the gun was in the car.  After Officer Phillips told Guinan that
handgun charges could possibly be filed against her, she changed her story. 
Guinan then said that appellant placed the gun in the trunk and was holding it
for someone.  Officer Phillips testified that he asked appellant about the gun
and that appellant told him that he did not know anything about the gun being
in the trunk.  Officer Phillips determined that the gun had been reported as being
stolen in a recent car burglary.  Officer Phillips seized the gun.  The State
introduced the gun into evidence as State’s Exhibit No. 2-A.  Ballistics
testing showed that State’s Exhibit No. 2-A was the gun that was used during
the March 4, 2009 shooting incident in front of Hale’s house.

            Guinan
testified that, on March 4, 2009, at about 6:00 or 6:30 p.m., she and appellant
were smoking marihuana while driving around in her tan, 2001 Chevrolet Cavalier.
 Guinan said that she and appellant were both “high” on marihuana.  Appellant
was driving the car.  Guinan testified that, as appellant turned left onto
South 12th Street from Chestnut Street, she and appellant saw Hale and a man
named Freddie Alcala standing in the front yard of a house.  There was no
testimony explaining who Alcala was or how any of the parties involved in the
case knew him.  Guinan said that Hale and Alcala started shooting at her car
and threw a brick that slid over the roof of her car.  Guinan said that she
heard gunshots but did not know whether Hale or Alcala had the gun.  She said
that the gun was fired “[a]t least once or twice.”  Guinan ducked when she
heard the shots and did not see either Hale or Alcala with a gun.  She believed
that a bullet hit her car.

Guinan
testified that appellant turned right onto Sycamore Street and turned right
again onto South 11th Street.  She said that appellant stopped the car and got a
gun out of the trunk.  Appellant then took a right turn on Chestnut Street and another
right turn onto South 12th Street. Guinan testified that, at that time, Hale
and Alcala were gone and that appellant shot the gun at the empty red Explorer. 
Guinan said that nobody was around when appellant was shooting at the
Explorer.  She said that appellant shot the gun about four times.  Guinan said
that, after she and appellant got home, she saw a bullet hole in one of her
car’s doors and scratches on top of the car from the brick.  Guinan testified
that she and appellant did not report the incident to the police because they
did not want to get into trouble.

Guinan
also testified that appellant bought the gun from a man at an Allsup’s
convenience store about “a week and a half” before the March 4, 2009 incident. 
Guinan admitted that she lied to Officer Phillips at the skate park when she
told him that she did not know there was a gun in the car and that she did not
know who owned the gun.  Guinan said that, after she talked with Officer Phillips,
she talked with police detectives at the law enforcement center.  Guinan
testified that she lied to the detectives when she told them that she did not
know anything about the March 4, 2009 shooting incident.

Appellant
also testified.  His testimony was similar to Guinan’s testimony.  Appellant
said that he and Guinan were listening to music and smoking a “blunt” of
marihuana while driving around in Guinan’s tan Chevrolet Cavalier.  Appellant
said that he turned left onto South 12th Street and that, as he did so, he saw Hale
and Alcala standing outside.  He said that, as he approached the stop sign, either
Hale or Alcala shot a gun and threw a brick at Guinan and him. He said that Hale
or Alcala fired the gun once or twice.  Appellant said that the brick bounced
off the roof of the car.  Appellant said that he turned right at the stop sign
and then made another right turn onto South 11th Street.  He said that he
stopped the car near South 11th Street and Chestnut and got the gun out of the
trunk.  He said that he bought the gun from a man named “Kenneth” at an
Allsup’s convenience store.  Appellant testified that he was “[b]eing stupid” when
he got the gun out of the trunk.  He said that he was not going to shoot anyone
but that he was “mad” at Hale and Alcala and intended “[t]o go back and scare
them.”  Appellant drove back to South 12th Street.  He said that, at that time,
nobody was outside and that he shot the gun about seven times into the vehicle.
 Appellant said that, later that night, he saw a bullet indentation in Guinan’s
car.

            Appellant
testified that he knew it was against the law to maliciously destroy private
property.  Appellant said that he was guilty of maliciously destroying private
property because he had caused almost $1,000 of damage to the Explorer.

Appellant
also testified about the March 16, 2009 incident at the skate park.  He said
that he did not “pull a gun” on Delacruz.  Appellant said that he and Delacruz
knew each other and that Delacruz knew that he had a gun. Appellant admitted
that he told Officer Phillips he did not know there was a gun in the car and
that this statement was a lie.  After talking with Officer Phillips, appellant
went to the law enforcement center and talked with Abilene Police Detective
Moschetto.  Appellant admitted that he told Detective Moschetto a number of
lies about the gun before ultimately telling Detective Moschetto that the gun
belonged to him.

On
March 20, 2009, appellant went back to the law enforcement center.  Appellant
saw Hale at that time.  Appellant said that he knew Hale had been talking with
police officers about the shooting at his house.  Appellant testified that he did
not tell the police officers that Hale and Alcala had shot at Guinan and him.

            Frank
M. Smith III testified as an expert witness for the defense.  He said that he
was a certified peace officer and a gunsmith for major firearm manufacturers. 
Smith had examined Guinan’s 2001 Chevrolet Cavalier.  Based on that
examination, Smith concluded that there had been a bullet strike on the left
rear door of the car.  Smith testified that the bullet did not penetrate the
metal of the car door but, instead, ricocheted off the door.  Smith said that
there was no way to determine when the bullet strike occurred.

            Appellant
called his mother, Cheryl Freeman, as a witness.  She testified that she became
aware that appellant had been involved in the March 4, 2009 shooting incident
the night of the incident.  The State then took Cheryl on voir dire.  During
questioning by the prosecutor, Cheryl said that any information she knew about
the incident had come from what appellant and Guinan told her about it.  The
State then objected to any testimony by Cheryl about the incident on hearsay
grounds.  Appellant’s counsel then stated as follows:

            It’s not
being offered for the truth of the matter asserted, Judge.  The purpose and it[s]
sole purpose is to refute the State inviting the jury to believe that this is
recent fabrication.  And if he told the same or similar story on the night in
question, it is rebuttal to the State’s theory of recent fabrication, and I
think she’s entitled to testify to it, and it’s not being offered for the truth
of the matter asserted.

 

The trial court sustained
the State’s objection.  At the request of appellant’s counsel, the trial court
held a hearing outside the presence of the jury.  During the hearing, Cheryl testified
that appellant called her on the night of the incident.  Cheryl said that
appellant was really scared.  According to Cheryl, appellant told her that “[Hale]
and them” threw bricks and shot at Guinan and him.  Appellant also told Cheryl that
he shot back when nobody was around.  Cheryl testified that she told appellant
that he needed to report the incident to the police.  Appellant responded,
“Mom, let’s just forget it because maybe it will just die down and, you know,
nothing else will happen.”  Following Cheryl’s testimony, the trial court again
ruled that her testimony was inadmissible.

            During
the guilt/innocence phase, appellant called Samuel David Brinkman, Ph.D. as an
expert witness.  Dr. Brinkman is a neuropsychologist.  The State objected to
any testimony by Dr. Brinkman.  At the State’s request, the trial court held a
hearing on the State’s objection outside the presence of the jury.  Appellant’s
counsel stated the following:

Judge, the reason I
want to call Dr. Brinkman is to show the mental state of my client, which could
explain to the jury many factors that they need to consider in determining
whether he’s guilty or not guilty.  One of those factors would be the issue of
if a man is shot at once or twice and a brick thrown upon his car, why he would
return back to subject himself again.  This is not normal behavior.  This is
not normal human behavior, and Dr. Brinkman would help to explain that to the
jury.

 




 

The prosecutor
then responded as follows:

 

            Your
Honor, what he’s asking for is some kind of impulse control issue, which Texas
does not recognize.  He’s testified it was a voluntary act, which is required,
and there’s no issue of competence or insanity in this case.

 

The trial court
sustained the State’s objection to Dr. Brinkman’s testimony.  Appellant’s
counsel then offered a report from Dr. Brinkman as an exhibit for the appellate
record.  Appellant’s counsel stated that “Dr. Brinkman would most likely
testify to what he put in his written report, and that would be our proffer so
that the appellate court can determine if these issues were admissible.”  The
State had no objection to the request that the report be included in the
record, and the report is included in the record.  Dr. Brinkman testified
before the jury during the punishment phase of the trial.

Standard
of Review

Appellant
complains of evidentiary error in both of his points of error.  We review a
trial court’s decision to admit or exclude evidence under an abuse of
discretion standard.  Oprean v. State, 201 S.W.3d 724, 726 (Tex. Crim.
App. 2006); Burden v. State, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001). 
An appellate court will not reverse a trial court’s ruling unless that ruling
falls outside the zone of reasonable disagreement.  Zuliani v. State, 97
S.W.3d 589, 595 (Tex. Crim. App. 2003); Burden, 55 S.W.3d at 615.

Evidence
of Appellant’s Mental State and Capacity

            In
his first point, appellant contends that the trial court erred by excluding Dr. Brinkman’s
testimony about appellant’s mental state and capacity.  The indictment alleged
that appellant intentionally and knowingly threatened Hale with imminent bodily
injury by the use of a handgun.  Aggravated assault by threat is a “nature of
conduct” offense that has no required result.  Landrian v. State, 268
S.W.3d 532, 536–37 (Tex. Crim. App. 2008); Johnson v. State, 271 S.W.3d
756, 761 (Tex. App.—Waco 2008, pet. ref’d); Dolkart v. State, 197 S.W.3d
887, 893 (Tex. App.—Dallas 2006, pet. ref’d).  Section 6.03 of the Penal Code defines
intentionally and knowingly, in relevant part, as follows: 

(a)
A person acts intentionally, or with intent, with respect to the nature of his conduct
. . . when it is his conscious objective or desire to engage in the conduct.

 

(b)
A person acts knowingly, or with knowledge, with respect to the nature of his
conduct or to circumstances surrounding his conduct when he is aware of the
nature of his conduct or that the circumstances exist.  

 

Tex. Penal Code Ann. § 6.03(a), (b)
(West 2011). Appellant asserts that, through Dr. Brinkman, he sought to
introduce evidence about “his mental state, cognitive abilities, low mental
functioning, poor executive function and perceptive abilities.”  Appellant
contends that this evidence was relevant to the issue of whether he had the “ability
to know . . . the nature of his conduct” and, therefore, was admissible to show
that he did not have the ability to form the culpable mental state – engaging
in intentional or knowing conduct – for committing the charged offense.

            Dr.
Brinkman evaluated appellant for the purpose of determining his competency to
stand trial.  Following that evaluation, Dr. Brinkman concluded that appellant
was competent to stand trial.  Dr. Brinkman prepared a report in connection
with his evaluation.  After the trial court excluded Dr. Brinkman’s testimony,
appellant introduced a copy of the report into the record for appellate
purposes.  Dr. Brinkman stated in the report that appellant’s medical records
indicated that he had “a long history of behavioral and emotional control
issues (especially anger control).”  In the summary and conclusions section of
the report, Dr. Brinkman stated that appellant “demonstrated borderline
intellectual functioning”; that appellant’s “[l]anguage and communication
skills were somewhat below normal but functional”; that appellant “demonstrated
marked disturbance of attentional processes and there was evidence of executive
dysfunction as well”; that appellant “has a long history of poor coping skills,
with angry outbursts, behavioral acting out, poor insight, and very limited
tendency to learn from experiences”; that appellant’s “poor coping abilities
probably reflect the very difficult early childhood experiences (abuse by
father and stepmother); and that “[t]here has been no evidence of psychosis.” 
Dr. Brinkman diagnosed appellant with “ADHD, combined type”; “Bipolar disorder
NOS”; “Post-traumatic stress disorder, chronic”; “History of alcohol,
marijuana, and other substance abuse”; “Personality disorder NOS with
antisocial trends”; and “Multiple concussions in past.”

            Appellant
did not raise insanity as an affirmative defense.  There is no affirmative defense
of “diminished capacity” in Texas, other than insanity.  Ruffin v. State,
270 S.W.3d 586, 593 (Tex. Crim. App. 2008); Jackson v. State, 160 S.W.3d
568, 573 (Tex. Crim. App. 2005).  However, diminished capacity is recognized as
a simple “failure-of-proof defense in which the defendant claims that the State
failed to prove that the defendant had the required state of mind at the time
of the offense.”  Jackson, 160 S.W.3d at 573.  As with other elements of
the offense, the defendant may present relevant evidence negating the requisite
mens rea.  Ruffin, 270 S.W.3d at 594; Jackson, 160 S.W.3d at 574. 
This evidence may include evidence of a defendant’s history of mental illness
or evidence of a defendant’s physical or mental diseases or defects.  Ruffin,
270 S.W.3d at 593–94; Jackson, 160 S.W.3d at 574.  But the evidence
still must meet generally applicable requirements for admission of evidence,
and it may be excluded at the guilt/innocence stage if it does not truly negate
the required mens rea.  Mays v. State, 318 S.W.3d 368, 381–82 (Tex.
Crim. App. 2010); Ruffin, 270 S.W.3d at 595–96.

            Ruffin
illustrates when evidence of mental disease or defect is admissible.  In that
case, the defendant was charged with multiple first-degree felony offenses of
aggravated assault of a public servant after he fired several shots at police
officers.  Ruffin, 270 S.W.3d at 587.  The mens rea element of the
charged offenses was that appellant intended to shoot at the police officers.  Id.
at 594.  The defendant and other lay witnesses testified that the defendant suffered
from delusions.  Id. at 596–97.  The defendant said that he believed he
was shooting at a “trespasser” and “hundreds of Muslims” instead of police officers.
 Id. at 590.  The trial court excluded expert testimony from the
defendant’s psychologist relating to the existence and severity of the
defendant’s mental disease and delusions, and the court of appeals held that
the trial court did not abuse its discretion by excluding the testimony.  Id.
at 587.   The court of criminal appeals held that the expert testimony was
relevant to rebut the mens rea element of the offense that the defendant
intended to shoot at police officers.  Id. at 596–97.  The court
explained as follows:

If . . . the
defendant suffers from mental delusions such that he sees a “trespasser” or a
“Muslim” when everyone else around him sees a police officer, he cannot be
convicted of intentionally shooting at a police officer, although he may be
convicted of intentionally shooting at a trespasser or Muslim.  Guilt of the
greater offense requires that the State prove, beyond a reasonable doubt, that
the defendant intended to shoot a police officer, not a trespasser or Muslim.

 

Id. at
594.  Thus, in Ruffin, the psychologist’s testimony, if believed, would have
lessened the offenses from first-degree aggravated assaults of police officers to
second-degree aggravated assaults (an intentional shooting at a “trespasser” or
at “Muslims”).  Id. at 594; see Mays, 318 S.W.3d at 381.  That
testimony negated the required mens rea for the offenses of aggravated assaults
of police officers.

            This
case is distinguishable from Ruffin.  Appellant and Guinan both
testified that nobody was present when appellant fired the shots.  Appellant
does not contend he was suffering from a mental defect or delusion that caused
him to fire the shots or to think that Hale was not present when Hale actually
was present.  Dr. Brinkman’s report makes no mention of delusions.  Dr. Brinkman’s
report indicates that appellant had limitations in cognitive ability and mental
functioning.  However, nothing in Dr. Brinkman’s report suggests that appellant
did not have the ability to form or did not form the culpable mens rea for
committing the offense.  Assuming that Dr. Brinkman’s testimony would be
consistent with what he stated in his report, that testimony, if believed,
would not negate the required mens rea for the offense.  Therefore, we conclude
that the trial court did not abuse its discretion in excluding it.  Mays,
318 S.W.3d at 382; Ruffin, 270 S.W.3d at 596.  Appellant’s first point
of error is overruled.

Evidence
of Prior Consistent Statement

            In
his second point, appellant contends that the trial court erred by excluding
evidence of a prior consistent statement that he made to his mother, Cheryl, on
the night of the incident.  The trial court sustained the State’s hearsay
objection to Cheryl’s testimony.  Therefore, the trial court excluded testimony
by Cheryl that appellant told her that “[Hale] and them” shot at Guinan and him
before he fired the shots and that nobody was present when he shot back.  Appellant
contends that evidence of his prior consistent statement was admissible because
it was offered to rebut the State’s implied charge against him of recent
fabrication of the testimony that Hale and Alcala shot at him.

            Rule
801(e)(1)(B) of the Rules of Evidence gives substantive, non-hearsay status to
prior consistent statements of a witness that are offered to rebut an express
or implied charge against the declarant of recent fabrication or improper
influence or motive.  Tex. R. Evid. 801(e)(1)(B);
Hammons v. State, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007).  To be
admissible, a prior consistent statement must be made before the motive to fabricate
arose.  Hammons, 239 S.W.3d at 804; Dowthitt v. State, 931 S.W.2d
244, 263 (Tex. Crim. App. 1996); Haughton v. State, 805 S.W.2d 405, 408
(Tex. Crim. App. 1990).  In this case, appellant had a motive to lie about the
incident as soon as he shot his gun at Hale’s Explorer.  Appellant knew that he
could get into trouble for shooting out the windows of the Explorer and,
therefore, had a motive to lie about the extent of his involvement in the
incident and being shot at by Hale and Alcala.  Because appellant had the same
motive to lie at the time of his statement to his mother as he did during his
testimony at trial, his statement to his mother on the night of the incident
was not admissible to rebut a charge of recent fabrication.  Hammons,
239 S.W.3d at 804.  Therefore, the trial court did not abuse its discretion by
excluding Cheryl’s testimony.  Appellant’s second point of error is overruled.

This
Court’s Ruling

            The judgment of the
trial court is affirmed.

 

                                                                                    

                                                                                                TERRY
McCALL

                                                                                                JUSTICE

 

February 9, 2012

Do not publish. 
See Tex. R. App. P.
47.2(b).

Panel consists of: Wright, C.J.,

McCall, J., and Kalenak, J.









[1]We note that the indictment contains the alias but that
the judgment does not.