# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00111-CR

**Calvin Jack Jones, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 340TH JUDICIAL DISTRICT
NO. C-09-0496-SB, HONORABLE BARBARA L. WALTHER, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Calvin Jack Jones of the offense of aggravated assault with a deadly weapon. *See* Tex. Penal Code Ann. § 22.02(a)(2) (West 2011). Punishment was assessed at ten years' imprisonment. In a single issue on appeal, Jones asserts that his trial counsel was ineffective for "rais[ing] an insanity defense at the last minute without providing the required notice and without presenting any proof to support the defense." We will affirm the judgment.

## BACKGROUND

The jury heard evidence that on April 8, 2009, Jones went to visit his neighbor, Ricky Sain. Sain testified that when Jones arrived at his barn early in the evening, Jones "had a pistol and five bullets and a bottle of whiskey and a cup." Sain found this "kind of odd," as Jones had never before brought whiskey and a gun to his barn. Another neighbor, Bob Hedrick, was also visiting Sain at the time. Jones proceeded to show Sain and Hedrick his pistol and explain how he

had "fixed the grip over the years" and how "it fit his hand really well." Jones then allowed Sain and Hedrick to handle the pistol. Sain could not recall whether Jones was drinking during their conversation, but he "assumed" that he was. At some point later that evening, Hedrick went home, and Sain and Jones continued talking. Eventually, Sain left the barn to check on his girlfriend in the house. As he left, Sain noticed that Jones was loading his pistol with the bullets. Sain interpreted this as an indication that Jones was "fixing to go on home."

When Sain returned to the barn, he noticed that Jones was still seated at the table, but he "was looking very strange . . . both hands under the table . . . just looking at me, staring." Sain thought, "'Well, he must be getting sick or something.' I even thought maybe he had a chill." Sain then turned around to look for his propane heater. At that moment, Sain heard a shot and immediately realized that Jones had fired his pistol at him. Sain reacted by trying to "get the gun" away from Jones. Sain shoved the table toward Jones and attempted to grab the pistol, but Jones continued shooting. The second shot grazed Sain's thumb, the third shot went past his ear, and the fourth shot hit him in the chest. Sain fell to the ground and tried to roll over, but he could not move because his arm had gone limp. Sain recalled, "I can't move, I can't roll over. I knew he had one more bullet. And all the time he was saying he was going to kill me." Sain continued, "I looked up. And he was pointing the gun at me. And as he pulled the trigger, I kicked [the gun] with my left foot; and it went to the left. The bullet—the gun went off; and it went somewhere to my left."

Sain testified that Jones then backed up, pointed the gun at Sain, and continued pulling the trigger. However, the gun was out of bullets. Jones then walked up to Sain and told him, "You made me use all my bullets, you motherfucker. You tricked me. You tricked me." Jones then

proceeded to repeatedly hit Sain with his pistol. Sain recalled that while Jones was hitting him, Jones told him, "I'm going to watch you die, you motherfucker. You're going to die on this floor right here. You tricked me. You tricked me into thinking you were my friend." Sain "had no idea" what Jones was talking about.

During the beating, Sain managed to reach his phone, which had fallen on the floor during the earlier struggle for the gun, and call his house. Sain's girlfriend, Evangeline Torres, testified that she answered the phone and heard Jones yelling and Sain crying out for help. Torres then ran out to the barn and saw Sain "laying in a pool of blood" while Jones was "hitting him over and over with a gun." Torres added, "And he stopped for a little bit just to catch his breath, and then he started hitting him again." Torres ran back inside the house and called her neighbors and 911.

The neighbors, including Bob Hedrick and his wife, arrived before the police. When the Hedricks tried to intervene, Jones allegedly pointed the gun at Bob's wife and ordered them to leave. However, another neighbor, Billy Wilson, eventually succeeded in convincing Jones to put down the gun. When the police arrived, Jones refused to comply with their commands and had to be tased three times and wrestled to the ground by the officers before they were able to subdue him.

Following his arrest, Jones was transported to the hospital and treated by Dr. Stephen Seifert, an emergency room physician, for minor bruises. Seifert testified that during the course of the treatment, which included a "mental status exam," Jones told him "that he had shot the victim, that he meant to, and that he would do it again." On cross-examination, defense counsel asked Seifert if Jones had "appear[ed] to be under the influence of anything." Seifert answered, "He

3

may have been under the influence of alcohol." Seifert came to this conclusion based on the "smell of alcohol" on Jones and an apparent admission from Jones "that he had had some drinks."

Counsel also inquired of Seifert, "Could you tell whether or not he was responding to you appropriately when you asked about his situation? Where you are, what you're doing, did he respond to you appropriately?" Seifert answered, "Absolutely. His mental faculties, whether having had alcohol or not, were—I would judge him competent." Seifert then clarified that he was simply referring to Jones's ability to answer questions, not whether Jones was "legally" competent. Seifert later added, "[I]n the course of the medical exam, the mental status exam, the questions that were being asked, he seemed to respond appropriately. A little belligerent but answered appropriately, the questions, with no indication that he was either incoherent or demented or confused or any other incapacitating mental status."

Jones testified in his defense. According to Jones, Sain had invited him over to his house on the night in question. Jones claimed that when he arrived, he kept his pistol in his vehicle but brought his whiskey with him into the barn. Sain had offered him a bottle of what appeared to be water, and Jones "remember[ed] sitting down and having one drink or one swallow" of the water mixed with his whiskey. Jones recalled, "The next thing I remember is him standing . . . away from the table against the barn wall; and I'm standing there with a gun in my hand." Jones then saw a car coming toward the barn. It parked, and then Jones saw two men get out of the truck and approach the barn. Jones testified, "When I saw the car coming in, in the dark like that, and the men coming up, the first thing that comes to my mind is, 'I've been set up.'"

4

Jones then "kind of went ballistic and went to pounding on Mr. Sain." However, Jones claimed that he "only had time to get in two or three licks. The next thing I remember was hands on my shoulder pushing me to the ground." Jones then had "a blank spell," and the next thing he remembered was having his hands secured behind his back on the ground and then being placed in a patrol car. Jones claimed not to remember being transported to the hospital, speaking with Dr. Seifert, or later that night speaking with law enforcement officers about the incident. Jones also denied discharging a firearm on the night in question.

Prior to closing arguments, the State requested a "motion in limine" prohibiting Jones from making any argument that he "might have been insane or incompetent at the time he committed the offense because he never gave notice" of an intent to raise an insanity defense.[1] Counsel replied, "We didn't do any notice of [insanity]. We didn't provide any notice that he was . . . competent or incompetent. I think the jury has heard the testimony from Mr. Sain that he appeared to be sick, whether or not he was competent or incompetent." The district court asked counsel, "[I]f you believed your client was not competent at the time of the offense, that is a defense that should have been raised. Are you now attempting to raise that defense?" Counsel responded,

> No, Your Honor. At the time—we're not saying that he was not competent at the time. We're not trying to raise a defense now. We're just saying something was wrong with him. We don't know what was wrong with him, but something was wrong with him. We don't know whether he had the ability to make decisions or have decisions.

---

[1] *See* Tex. Code Crim. Proc. Ann. art. 46C.051 (West 2006) (providing that defendant planning to offer evidence of insanity defense must file notice with court at least 20 days before date case is set for trial).

5

The district court advised counsel, "[T]hat is an attempt at a defense that your client did not know what he was doing. You have not filed any notice of insanity. The Court has heard nothing of insanity nor of competency." Counsel continued to emphasize to the court that he was merely trying to argue the "facts of the case," not raise an insanity defense. Counsel acknowledged, "[H]e doesn't fit the category of being incompetent, he doesn't fit the category of being insane. If a psychologist was to examine him, it wouldn't have been applicable in this particular case." Counsel explained that he merely wanted to argue that there was evidence presented that Jones did not have the required "criminal intent" to commit the crime. The State claimed that this was "a round-about way" of arguing insanity.

The district court, still believing counsel to be arguing insanity, then asked counsel if he had "good cause" for failing to provide notice.[2] Counsel maintained,

> Your Honor, we are not asking for an insanity defense in this case. We have not presented one, we have not given notice. However, when . . . Mr. Sain testified that Mr. Jones looked sick and when Mr. Jones testified as to what he knew, that was not insanity and that was not incompetency. It was a physical condition; it's something that came up. And all his testimony was allowed in . . . without objection by the State. Since his testimony was allowed in without objection by the State, we believe his motion in limine ought to be overruled. It is not an insanity defense that we're pushing forward.

The district court replied,

---

[2] *See id*. art. 46C.052 (West 2006) (providing that unless notice is timely filed, "evidence on the insanity defense is not admissible unless the court finds that good cause exists for failure to give notice").

I believe this to have been a strategy of the defense from the beginning. The Court finds that notice was not given, that it would be improper to argue reduced responsibility or no responsibility at all under a theory of insanity without using the magic words. If you make that argument, the Court will instruct the jury that there has been no application for insanity or notice given and that they should disregard that argument.

However, as the discussion with counsel continued, the district court appeared to come to a different understanding of the defensive theory that counsel was attempting to present and allowed him to argue it:

[The Court]: Has your client ever been examined by anybody on this?

[Counsel]: He has been examined by several doctors. The problem is he's fully competent when he talks to the doctors. We've discussed—we've attempted to discuss this with other doctors to see if he could even get an MRI to see what might have happened or what happened to him. He's been to three doctors, and nobody thinks it's necessary for him to be examined.

[The Court]: [Counsel], an MRI does not give you an explanation for insanity.

[Counsel]: Your Honor, again, we do not believe it's insanity. We do not believe it's temporary insanity. We believe it's a physiological problem that occurred, and that's what we were attempting to discover. That's why we don't believe that this—the insanity is applicable.

[The Court]: So your argument is that he had some sort of physiological blackout and that that is why this occurred?

[Counsel]: He had some type of physiological affect from some result; and because of the physiological affect, all he remembers is what he remembers; and he is responsible for what he remembers.

[The Court]: So under that theory a defendant is only responsible if the defendant commits the act—commits the act and remembers committing it?

7

[Counsel]: No, Your Honor. . . . [H]e's responsible for committing the act. But if you go into the code, in the definitions, a person acts intentionally or with intent or with awareness or with knowledge that he was committing it. If he didn't have the awareness . . . but was consciously disregarding, then that's part of the problem. "Was he consciously disregarding?" Mr. Sain said he was sick, Mr. Wilson said he didn't respond to his requests, and Mr. Jones testified about what he knew and what he saw.

[Prosecutor]: Your Honor, the only evidence that would show any reason for him to have blacked out was consumption of alcohol; and consumption of alcohol is not a defense. Voluntary consumption of alcohol is not a defense. There is no other evidence that there's wrong—they can't find any [sic]. He's been to the doctor. They don't have any indication. There's no indication he did anything other than voluntarily consume Lord Calvert Whisky. But that's not a defense at all.

[The Court]: Well, if the Defendant makes that type of argument, you will be permitted to address that in your closing statements.

[Prosecutor]: Yes, ma'am.

[The Court]: But just so that I am sure, there is no request for the jury to find the Defendant not guilty because of insanity?

[Counsel]: We are not requesting that.

[The Court]: All right. And, [prosecutor], you are entitled to object if the opposing side argues outside the evidence, just as the defense attorney is entitled to object if you argue outside the evidence.

The parties then proceeded to present their closing arguments without objection.

The jury found Jones guilty as charged, and the case proceeded to punishment. In accordance with the jury's verdict, the district court sentenced Jones to ten years' imprisonment. This appeal followed.

## STANDARD OF REVIEW

To prevail on a *Strickland* claim, Jones must prove by a preponderance of the evidence that counsel was ineffective. *Perez v. State*, 310 S.W.3d 890, 892 (Tex. Crim. App. 2010) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). There are two required components of an ineffectiveness claim: performance and prejudice. *Id*. First, Jones must prove that counsel's performance was deficient. *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892. To satisfy this prong of the analysis, Jones "must show that counsel's representation fell below an objective standard of reasonableness" based upon "prevailing professional norms." *Strickland*, 466 U.S. at 688; *Perez*, 310 S.W.3d at 893. For this performance inquiry we consider all of the circumstances, with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688-89; *Perez*, 310 S.W.3d at 893.

"Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To succeed under the prejudice component, Jones "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Rather, he must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of

9

the evidence before the judge or jury." *Id*. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id*. at 696.

## ANALYSIS

In his sole issue on appeal, Jones asserts that his trial counsel was ineffective by "rais[ing] an insanity defense at the last minute without providing the required notice and without presenting any proof to support the defense." According to Jones, this denied him "the opportunity to present the only viable defense he had to the crime."

In this case, because no motion for new trial was filed, our review of counsel's performance is limited to the record of the proceedings during Jones's trial. Jones claims that the exchange between counsel and the district court, summarized above, is sufficient to prove that counsel was ineffective. We disagree.

First, contrary to Jones's claim, the record does not demonstrate that counsel raised an insanity defense "at the last minute." Instead, as counsel explained to the district court, he was not raising an insanity defense at all. Insanity is "an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." Tex. Penal Code Ann. § 8.04(a) (West 2011). "This defense excuses the person from criminal responsibility even though the State has proven every element of the offense, including the mens rea, beyond a reasonable doubt." *Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008). Counsel's theory of the case was not that Jones had committed the crime but should be excused from responsibility. Rather, his theory was that Jones did not commit the

crime because he did not have the requisite mens rea. In other words, counsel was attempting to negate an essential element of the charged offense, specifically that Jones committed the offense intentionally, knowingly, or recklessly. On the record before us, we cannot conclude that attempting such a defense fell below an objective standard of reasonableness, particularly in light of the overwhelming evidence that Jones committed the actus rea of the offense.

We similarly cannot conclude on this record that counsel's decision not to pursue an insanity defense fell below an objective standard of reasonableness. A decision not to pursue an insanity defense can be a matter of trial strategy. *See, e.g.*, *Faz v. State*, 510 S.W.2d 922, 926 (Tex. Crim. App. 1974); *Gottson v. State*, 940 S.W.2d 181, 185 (Tex. App.—San Antonio 1996, pet. ref'd). When the record is silent regarding trial counsel's strategy, we will not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *see also Vasquez v. State*, 830 S.W.2d 948, 950 n.3 (Tex. Crim. App. 1992) ("[J]ust because a competent defense attorney recognizes that a particular defense *might* be available to a particular offense, he or she could also decide it would be inappropriate to propound such a defense in a given case.").

We cannot say on this record that no competent attorney would have decided not to pursue an insanity defense, particularly in light of the absence of evidence in the record supporting a theory that Jones "did not know that his conduct was wrong." In fact, counsel represented to the district court, "[H]e doesn't fit the category of being incompetent, he doesn't fit the category of being insane. If a psychologist was to examine him, it wouldn't have been applicable in this particular case." Counsel added that Jones had been "examined by several doctors" and that "he's

11

fully competent when he talks to the doctors." This was consistent with the trial testimony of Dr. Seifert, who explained that when he had examined Jones shortly after the offense had been committed, Jones answered questions "appropriately . . . with no indication that he was either incoherent or demented or confused or any other incapacitating mental status."[3] We cannot conclude on such a record that counsel was deficient for failing to raise an insanity defense. *See Wilkerson v. State*, 726 S.W.2d 542, 551 (Tex. Crim. App. 1986) (when record contained no evidence that defendant may have been legally insane at time offense was committed, insanity "was simply not a viable defense to advance," and counsel was not deficient "by failing to raise a non-existent defense at trial"); *Brown v. State*, 129 S.W.3d 762, 767 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (declining to find counsel ineffective for failing to raise insanity defense when "[n]o evidence in the record demonstrates that appellant was incompetent or insane").

We also cannot conclude on this record that Jones proved that he was prejudiced by counsel's decision not to raise an insanity defense. The record fails to show a reasonable probability that, but for counsel not raising an insanity defense, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 693-96.

We overrule Jones's sole issue on appeal.

---

[3] Jones argues that his violent behavior, which he characterizes as "bizarre at best" and lacking a "reasonable explanation" or motive, was evidence of his insanity, as was his professed inability to remember exactly what happened. However, such evidence is insufficient to raise an insanity defense. *See, e.g.*, *Still v. State*, 709 S.W.2d 658, 661 (Tex. Crim. App. 1986); *Jeffley v. State*, 938 S.W.2d 514, 515 (Tex. App.—Texarkana 1997, no pet.); *Lugo v. State*, 732 S.W.2d 662, 667 (Tex. App.—Corpus Christi 1987, no pet.). To raise an insanity defense as that term is legally defined, there must be evidence presented that the defendant did not know that his conduct was wrong. *See Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008). No such evidence exists in this case.

**CONCLUSION**

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed

Filed:   August 11, 2011

Do Not Publish