**Affirmed and Memorandum Opinion filed May 5, 2022.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-20-00233-CR

---

**CHANCE  MICHAEL  MOSELEY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 10th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 16CR1372**

---

## MEMORANDUM  OPINION

Appellant Chance Michael Moseley appeals his conviction of capital murder. Tex. Penal Code § 19.03(a)(7)(a), (8). The State did not seek the death penalty, and appellant received a life sentence with the chance of parole. In two issues he argues that the trial court (1) abused its discretion by excluding expert witness testimony; (2) erred by shifting the burden of proof to appellant on his defensive theory; and (3) because of these errors, "it cannot be determined beyond

a reasonable doubt that the trial court's error did not contribute to [appellant's] conviction." We affirm.

## I.   GENERAL BACKGROUND

Appellant stabbed his mother fifty-seven times and strangled her with an electrical cord.   The medical examiner determined that mother died from strangulation.  Appellant was fourteen at the time of the murders and mother was seventeen weeks pregnant.  At trial appellant raised two defensive theories.  The first defensive theory was that he did not have the specific intent or *mens rea* to kill mother and the unborn child.  To support this theory, appellant offered the testimony of Gerald Harris, a clinical psychologist who met with and evaluated appellant.

The second defensive theory was whether the unborn child had already died due to mother's drug use prior to the murders.  Appellant advanced this theory through testimony that mother, who had numerous children she could not take care of, was intending to induce a miscarriage by using copious amounts of alcohol and methamphetamine.  A witness testified that mother had used this method in the past to induce miscarriages of unwanted pregnancies.

Appellant testified that on the day of the murders mother took him with her to a drug house so that she could purchase and use drugs.  After spending most of the day at the drug house, mother appeared to be "very high," nervous, and agitated.  Mother and appellant went home and proceeded to argue over household chores.  The argument escalated into a physical conflict with appellant stabbing mother fifty-seven times.  Appellant testified that mother was unconscious from blood loss but still breathing.  Appellant then used an electrical cord to strangle mother and put her "out of her misery."  Appellant testified that he was "in shock"

2

and was not thinking about the unborn child because "it was never going to live" due to the methamphetamine in mother's system.

## II. EXPERT WITNESS

In his first issue appellant contends that the trial court abused its discretion by excluding the testimony of his expert witness, Dr. Gerald Harris, to testify about appellant's specific intent at the time of the murders.

### A. General Legal Principles

We review the trial court's decision to exclude expert testimony for an abuse of discretion. *Dooley v. State*, 582 S.W.3d 309, 311 (Tex. App.—Fort Worth 2018, no pet.). Expert testimony is admissible so long as (1) the witness qualifies as an expert by reason of his or her knowledge, skill, experience, training, or education; (2) the subject matter is one that is appropriate for expert testimony; and (3) admitting the expert testimony will help the factfinder in deciding the case. Tex. R. Evid. 702. As the sponsoring party, appellant was required to demonstrate by clear and convincing evidence that the expert's testimony was (1) based on a reliable foundation and (2) relevant to the issues in the case. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011).

Expert testimony regarding a defendant's state of mind or intent has been held admissible in limited circumstances, including cases (1) involving the defense of insanity; (2) involving the defense of self-defense in a domestic violence situation; or (3) where such testimony may be relevant to rebut or disprove the defendant's culpable *mens rea*. *Dooley*, 582 S.W.3d at 312 (collecting cases). However, under the third category, such evidence may be excluded if it does not truly negate the required *mens rea*. *Ruffin v. State*, 270 S.W.3d 586, 596 (Tex.

3

Crim. App. 2008); *Dooley*, 582 S.W.3d at 313 (holding that expert testimony did not negate defendant's *mens rea* but instead provided an excuse for his behavior).

## B. Background

Outside of the presence of the jury, appellant proffered the testimony of the expert regarding appellant's intent at the time of the murders. The expert testified that during his evaluation of appellant, they went over the "history and the facts and circumstances" and in his opinion, at the time of the murders appellant was "not functioning properly." The expert elaborated by testifying that appellant "got caught up in an emotional struggle with his mom, and [the expert didn't] think he was fully aware of what he was doing." The expert opined that appellant did not specifically intend to kill the unborn child. When asked how the expert was able to determine someone's specific intent during an event that had occurred many years prior, the expert responded that he and appellant "talked about that time, the time leading up to the period. In a sense, it's almost a mood induction, so that [appellant] is kind of reliving that day and talking to me about what he's thinking and what his intent was." The expert testified that children do not always follow a logical thought process in the same way as an adult and are very impulsive.

After this testimony, appellant argued that the expert's opinion was vital to his ability to present a complete defense regarding appellant's specific intent to kill the unborn child. The State argued that the expert's opinion is based on a discussion with appellant and that there "is no scientific test or a way to determine a person's specific intent at a specific time."

## C. Analysis

In this case, appellant proffered his expert's testimony to rebut or dispute appellant's culpable *mens rea*. The question is whether the expert's testimony was

offered to provide an excuse or whether it was probative as to *mens rea*. *See Dooley*, 582 S.W.3d at 313. The *mens rea* of capital murder as it was charged in this case was twofold: (1) appellant's intent to kill mother; and (2) appellant's intent to kill the unborn child. *See* Tex. Pen. Code § 19.03(a)(7)(a), (8). Appellant argues that the expert's testimony that appellant was "not functioning properly" and "not fully aware of what he was doing" would go to "the very issue at the heart of the case," appellant's intent at the time of the murders and was relevant and admissible to negate the *mens rea* of murder. We disagree.

The proffered testimony of the expert was brief, did not explain what the expert relied on to arrive at his conclusions, conclusively stated that children act "impulsively," that appellant was "not fully aware" of what he was doing, and that appellant was "not functioning properly." The expert did not indicate that appellant suffered from some mental deficiency or delusions that would have prevented him from understanding that he was killing another person, thus preventing appellant from being able to form the requisite *mens rea* at the time of the murders. *See Ruffin*, 270 S.W.3d at 593 ("If . . . the defendant suffers from mental delusions such that he sees a 'trespasser' or a 'Muslim' when everyone else around him sees a police officer, he cannot be convicted of intentionally shooting at a police officer, although he may be convicted of intentionally shooting at a trespasser or Muslim.").

Instead, appellant's expert offers an excuse for appellant's criminal actions by concluding that because he was a child,[1] he acted impulsively and irrationally. *See Dooley*, 582 S.W.3d at 314 n.2 (noting that "much violent criminal behavior could be characterized as irrational and impulsive"). The expert did not explain

---

[1] Appellant was fourteen at the time of the murders but the juvenile court waived jurisdiction and transferred appellant to criminal district court. *See* Tex. Fam. Code § 54.02(a).

how appellant was not "functioning properly" or "fully aware" on the day of the murders or how this prevented appellant from forming the required *mens rea*. The expert did not opine that appellant was suffering from delusions or from a mental condition at the time of the murders. Because the expert's testimony failed to provide competent evidence of appellant's *mens rea* at the time of the murders, it was irrelevant. *See id.* at 313. The trial court did not abuse its discretion in excluding the expert's testimony. *See id.*

We overrule appellant's first issue.

### III.    DEFENSIVE THEORY AND BURDEN OF PROOF

In his second issue appellant argues that "the trial court erred by not allowing counsel . . . to cross-examine [the State's medical examiner] about another cause of death for the fetus 'if there isn't any proof of it' because it impermissibly shifted the burden of proof."

#### A.    Background

The State called the medical examiner to testify regarding the autopsy and causes of death of mother and the unborn child. The State sought to introduce photographs of the autopsy of mother and a photograph and demonstrative aid of the unborn child. Appellant objected and conferenced at the bench. The trial court dismissed the jury while the parties discussed the exhibits and whether they should be admitted into evidence.

Appellant objected that the medical examiner did not take the photographs and, therefore, could not authenticate them. Appellant further objected that the photographs, particularly exhibit 230,[2] were "far too prejudicial than probative."

---

[2] Exhibit 230 is not in the appellate record and is purportedly a photograph of the unborn child from the autopsy examination.

Appellant argued that the photographs were duplicative of other evidence because the jury had already seen mother's body and stomach and could tell she was pregnant:

> The question is . . . where exactly the fetus died at. And I think that she's well within her right to testify that, based on her review of the photos, she can make that determination. However, I don't think that that (sic) makes these photos admissible. She didn't take them. She wasn't there.

Appellant also raised concerns that no testing was done on the unborn child to determine whether the unborn child had any methamphetamine in the unborn child's blood. The State responded that:

> I believe that the [medical examiner] will testify that the fetus in this case does not appear to have died in another way, that fetuses that die in utero have a different look, have kind of a different color to them. Sometime, there's - - she'll talk about what is skin slippage and none of that is present in this case.

Appellant re-urged his argument that the photographs of the unborn child would serve to only "inflame" the jury and that the medical examiner did not need the photographs to testify about the unborn child's cause of death.

> The trial court ruled that:

> given the nature of this case . . . I'm not going to allow the photographs of the fetus into evidence. But there will be no cross-examination or . . . no inference later, that the death was for some other reason if there isn't any proof of it. And you don't have an expert, and so, depending on where the cross-examination goes and how the direct goes, I will reconsider that if it becomes something to establish for the State, their case, that the photograph shows something that we may — it may very well come in. You can cross-examine on it. You can talk about it. You know, "What did the fetus show," et cetera, but we will not show the photograph. But if - - if we get into it on cross, you may have opened the door and . . . we may go back to it.

7

On voir dire, the medical examiner testified that the reason the fetus died was because mother died and that the photograph of the unborn child would be useful to illustrate her opinion as to how she could tell the unborn child died when mother died, as opposed to before mother died. The medical examiner testified the unborn child would look different because in an "intrauterine fetal demise," assuming they've died in the womb for at least a few hours, they look "grayish" in color and their "skin starts to peel off." The fact that there was a four-day period between the death and the autopsy would not change the appearance of the unborn child because:

> There was some decompositional (sic) changes, but that was . . . consistent with the mother. . . . a fetus that's sitting in a womb of a deceased person won't take on the findings that we would call it maceration, which is the color of the skin and the skin peeling off. That won't happen unless the mother is alive. So, there has to be blood flow to a deceased . . . fetus to make that happen.

Still on voir dire, the medical examiner testified that it is possible that due to mother's methamphetamine consumption that the fetus could have died prior to or even just before mother was murdered. She testified that the amount of methamphetamine in mother's system was "high" but difficult to determine due to the length of time between mother's death and testing. The medical examiner did not know what affect this "high" level of methamphetamine had on the unborn child and did not know whether the unborn child was in the "process of dying" at the time of mother's death, but it did not "look like a typical intrauterine fetal demise case." The medical examiner agreed that she did not need the photograph of the unborn child to testify about her findings unless there was a question about whether the unborn child died prior to mother. The photograph at issue did not tell the medical examiner that the "fetus predeceased the mother."

8

The trial court ruled that "[f]or the moment the photographs will not come in. You will have to be very, very careful on your cross-examination. If you raise the issue too much so that the State and the [medical examiner] have to support their opinions, then it's going to come in." The trial court indicated that appellant could ask the medical examiner about whether mother's methamphetamine consumption was harmful to the unborn child but if appellant asked whether it probably caused the unborn child to die before mother, then the photograph would be admissible.

On cross-examination before the jury, appellant did not directly ask whether it was possible that the unborn child died prior to mother due to mother's drug use. Instead, appellant focused his questions on whether the use of methamphetamines put the unborn child and mother at a higher risk of death. The photograph at issue was not admitted into evidence.

## B.   Analysis

Appellant urges that the trial court impermissibly shifted the burden of proof and prevented him from cross-examining the State's medical examiner regarding whether the unborn child died prior to mother due to mother's use of methamphetamines. This misstates the record. The trial court did not prevent appellant from putting on evidence that the unborn child died due to mother's drug use; the trial court merely indicated that appellant could open the door to the photograph of the unborn child taken during the autopsy if he did. Thus, the trial court did not require "proof that the [unborn child] died from [mother's] drug use before [the medical examiner's] conclusions could be questioned."

We overrule appellant's second issue.

9

## IV. CONCLUSION

Having overruled appellant's issues on appeal, we affirm the judgment of the trial court.[3]


/s/ Ken Wise
   Justice


Panel consists of Justices Wise, Bourliot, and Zimmerer. (Bourliot, J., concurring without opinion).

Do Not Publish — TEX. R. APP. P. 47.2(b).

---

[3] Because we overruled appellant's first two issues and concluded there was no error, we do not address appellant's third issue. *See Middleton v. State*, 125 S.W.3d 450, 453–54 (Tex. Crim. App. 2003) (concluding no error in jury charge and not conducting harmless error analysis); *Moreno v. State*, 821 S.W.2d 344, 354 (Tex. App.—Waco 1991, pet. ref'd) ("A harmless-error analysis is not necessary if there was no error or if the error was fundamental.").