**Opinion filed February 9, 2012**



In The

# Eleventh Court of Appeals

_____

## No. 11-10-00057-CR

_____

## WILLIAM JOSEPH MARSHALL
## A/K/A WILLIAM MARSHALL FREEMAN, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 350th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 9072-D**

### MEMORANDUM OPINION

The jury convicted William Joseph Marshall a/k/a William Marshall Freeman[1] of aggravated assault with a deadly weapon and assessed his punishment at confinement for eleven years. We affirm.

*The Charged Offenses*

The indictment contained two counts. Count One alleged that, on or about March 4, 2009, appellant committed the offense of aggravated assault in that he "did then and there

---

[1] We note that the indictment contains the alias but that the judgment does not.

intentionally and knowingly use and exhibit a deadly weapon, to-wit: A HANDGUN, and the said [appellant] did then and there intentionally and knowingly threaten PATRICK DELL HALE with imminent bodily injury by the use of said deadly weapon." Count Two alleged that, on or about March 4, 2009, appellant committed the offense of deadly conduct in that he "did then and there knowingly discharge a firearm at and in the direction of [Hale]." The jury convicted appellant of the aggravated assault offense charged in Count One.

*Points of Error on Appeal*

Appellant presents two points of error for review. In his first point, appellant contends that the trial court erred by excluding the expert testimony of a neuropsychologist concerning appellant's mental state and capacity. In his second point, appellant contends that the trial court erred by excluding evidence of a prior consistent statement made by him.

*The Evidence at Trial*

Although appellant does not challenge the sufficiency of the evidence to support his conviction, we will summarize the evidence to provide context for the issues on appeal. The record shows that Patrick Dell Hale lived at 1043 South 12th Street in Abilene, Texas. Hale testified that, on March 4, 2009, at about 6:30 p.m., he and his cousin, Justin Scott Fenwick, were standing in his front yard. Hale said that nobody else was with them. Hale's house was located at the corner of South 12th Street and Sycamore Street. Hale's red Ford Explorer was parked in the street in front of the house facing east toward Chestnut Street. Fenwick's Ford Mustang was parked in the lot next to Hale's house.

Hale testified that he saw appellant driving a gold Chevrolet Cavalier north on Sycamore Street toward South 11th Street. Hale said that appellant and Wesley Freeman (Freeman) were brothers. Freeman and Hale had had problems with each other in the past. Hale said that, before the date of the incident, he had seen appellant with Freeman. Hale knew appellant by the name, "Bubba." Appellant's girlfriend, Hannah Guinan, was in the car with appellant.

Hale testified that appellant stopped the car on Sycamore Street between South 12th Street and South 11th Street. Appellant then got out of the car, popped the trunk, and got a black case from the trunk. Hale testified that appellant got back into the car and made a right turn onto South 11th Street. Hale next saw appellant as he turned onto South 12th Street from Chestnut Street. As appellant approached Hale's house, Hale saw appellant holding a gun. Hale told Fenwick that appellant had a gun. Fenwick ran and hid behind his Mustang. Hale saw appellant

2

cock the gun. Hale said that appellant started shooting the gun when he got beside Hale's Explorer. Hale ducked behind his Explorer. He said that he would have been shot in the face if he had not ducked. Hale said that appellant fired five shots and shot out windows of the Explorer. Hale could hear the gun firing and the windows breaking. Hale said that he threw a brick at appellant's car after appellant fired the five shots. According to Hale, appellant turned left onto Sycamore Street and then fired four more shots. Hale said that one bullet hit the ground near his foot. He believed that some of the bullets hit his neighbor's house. Appellant drove away from the scene. Fenwick called Hale's sister to let her know what had happened, and Hale's sister called the police. Hale said that he and Fenwick did nothing to provoke appellant into shooting at them. Hale also said that neither he nor Fenwick shot a gun.

Fenwick also testified. In most respects, his testimony was similar to Hale's testimony. Fenwick testified that he and Hale were talking with each other as they stood on the sidewalk in front of Hale's house. Fenwick said that he saw a man driving a tan or gold Chevrolet Cavalier on Sycamore Street toward South 11th Street. Fenwick said that there was a female passenger in the car. Fenwick did not know appellant and had never seen him before the incident. During his testimony, Fenwick identified appellant as the man who was driving the car. Fenwick testified that appellant stopped the car and grabbed a black box from the trunk. Appellant turned from Chestnut Street onto South 12th Street. Hale said that appellant had a gun, and Fenwick saw appellant cock the gun right before he got to Hale's neighbor's house. Fenwick ran to his car and hid behind it. Appellant started shooting the gun. Fenwick said that he heard five shots. Fenwick said that appellant turned from South 12th Street onto Sycamore Street. As appellant was turning, Fenwick heard four more shots. Fenwick said that he did not shoot at appellant's car, that neither he nor Hale had a weapon, and that neither he nor Hale did anything to provoke appellant into shooting at them.

Abilene Police Officer Jeff Farley testified that, on March 4, 2009, at about 6:30 p.m., he heard seven gunshots while he was loading gear into his police car at the law enforcement center. He said that the noise from the shots came from south of the law enforcement center. Soon thereafter, police dispatch made a call that shots had been fired in the 1200 block of Sycamore Street. Officer Farley drove to the scene. When he arrived, Hale and Fenwick were standing in front of the house at 1043 South 12th Street. They were looking at a red Ford Explorer that was parked in front of the house. Officer Farley testified that the back window of the Explorer was

3

shattered and that the passenger's side rear window was damaged. Hale and Fenwick told Officer Farley that a man nicknamed either "Little Will" or "Bubba" had driven by the house, shot at them, and left the scene. Officer Farley later determined that "Little Will" or "Bubba" was appellant. Hale and Fenwick also told Officer Farley that the neighbor's house may have been hit by a bullet. Officer Farley testified that he saw a bullet hole in the northwest corner of the neighbor's house. Officer Farley also testified that he and Abilene Police Officer Christopher Heard found and collected four bullet casings in the street near the rear of the Explorer. Officer Farley also collected bullet fragments that Hale found in the floorboard of the driver's side of the Explorer.

Abilene Police Officer Shad Phillips testified that, on March 16, 2009, he responded to a call that there had been an armed subject at a skate park. Officer Phillips talked with Chris Delacruz, the alleged victim in the incident. Delacruz told Officer Phillips that he and appellant got into an argument with each other at the skate park and that appellant retrieved a handgun from the trunk of a tan sedan. Delacruz told Officer Phillips that he fled the scene in his vehicle after seeing appellant with the gun. Officer Phillips went to the skate park to look for the tan sedan. He saw a car matching that description with license plate no. KNW-166. The car was unoccupied. The evidence showed that this car was Guinan's Chevrolet Cavalier that appellant was driving during the March 4, 2009 incident. Officer Phillips testified that he saw two males and two females get into the car. Officer Phillips made contact with the occupants in the car. Appellant and Guinan were two of the occupants. Officer Phillips testified that Guinan gave him consent to search the trunk of the car. Under the wheel well cover, Officer Phillips found a black handgun pouch containing a .9 millimeter, semiautomatic handgun.

Officer Phillips asked Guinan about the handgun. Guinan told Officer Phillips that she did not know the gun was in the car. After Officer Phillips told Guinan that handgun charges could possibly be filed against her, she changed her story. Guinan then said that appellant placed the gun in the trunk and was holding it for someone. Officer Phillips testified that he asked appellant about the gun and that appellant told him that he did not know anything about the gun being in the trunk. Officer Phillips determined that the gun had been reported as being stolen in a recent car burglary. Officer Phillips seized the gun. The State introduced the gun into evidence as State's Exhibit No. 2-A. Ballistics testing showed that State's Exhibit No. 2-A was the gun that was used during the March 4, 2009 shooting incident in front of Hale's house.

4

Guinan testified that, on March 4, 2009, at about 6:00 or 6:30 p.m., she and appellant were smoking marihuana while driving around in her tan, 2001 Chevrolet Cavalier. Guinan said that she and appellant were both "high" on marihuana. Appellant was driving the car. Guinan testified that, as appellant turned left onto South 12th Street from Chestnut Street, she and appellant saw Hale and a man named Freddie Alcala standing in the front yard of a house. There was no testimony explaining who Alcala was or how any of the parties involved in the case knew him. Guinan said that Hale and Alcala started shooting at her car and threw a brick that slid over the roof of her car. Guinan said that she heard gunshots but did not know whether Hale or Alcala had the gun. She said that the gun was fired "[a]t least once or twice." Guinan ducked when she heard the shots and did not see either Hale or Alcala with a gun. She believed that a bullet hit her car.

Guinan testified that appellant turned right onto Sycamore Street and turned right again onto South 11th Street. She said that appellant stopped the car and got a gun out of the trunk. Appellant then took a right turn on Chestnut Street and another right turn onto South 12th Street. Guinan testified that, at that time, Hale and Alcala were gone and that appellant shot the gun at the empty red Explorer. Guinan said that nobody was around when appellant was shooting at the Explorer. She said that appellant shot the gun about four times. Guinan said that, after she and appellant got home, she saw a bullet hole in one of her car's doors and scratches on top of the car from the brick. Guinan testified that she and appellant did not report the incident to the police because they did not want to get into trouble.

Guinan also testified that appellant bought the gun from a man at an Allsup's convenience store about "a week and a half" before the March 4, 2009 incident. Guinan admitted that she lied to Officer Phillips at the skate park when she told him that she did not know there was a gun in the car and that she did not know who owned the gun. Guinan said that, after she talked with Officer Phillips, she talked with police detectives at the law enforcement center. Guinan testified that she lied to the detectives when she told them that she did not know anything about the March 4, 2009 shooting incident.

Appellant also testified. His testimony was similar to Guinan's testimony. Appellant said that he and Guinan were listening to music and smoking a "blunt" of marihuana while driving around in Guinan's tan Chevrolet Cavalier. Appellant said that he turned left onto South 12th Street and that, as he did so, he saw Hale and Alcala standing outside. He said that, as he

5

approached the stop sign, either Hale or Alcala shot a gun and threw a brick at Guinan and him. He said that Hale or Alcala fired the gun once or twice. Appellant said that the brick bounced off the roof of the car. Appellant said that he turned right at the stop sign and then made another right turn onto South 11th Street. He said that he stopped the car near South 11th Street and Chestnut and got the gun out of the trunk. He said that he bought the gun from a man named "Kenneth" at an Allsup's convenience store. Appellant testified that he was "[b]eing stupid" when he got the gun out of the trunk. He said that he was not going to shoot anyone but that he was "mad" at Hale and Alcala and intended "[t]o go back and scare them." Appellant drove back to South 12th Street. He said that, at that time, nobody was outside and that he shot the gun about seven times into the vehicle. Appellant said that, later that night, he saw a bullet indentation in Guinan's car.

Appellant testified that he knew it was against the law to maliciously destroy private property. Appellant said that he was guilty of maliciously destroying private property because he had caused almost $1,000 of damage to the Explorer.

Appellant also testified about the March 16, 2009 incident at the skate park. He said that he did not "pull a gun" on Delacruz. Appellant said that he and Delacruz knew each other and that Delacruz knew that he had a gun. Appellant admitted that he told Officer Phillips he did not know there was a gun in the car and that this statement was a lie. After talking with Officer Phillips, appellant went to the law enforcement center and talked with Abilene Police Detective Moschetto. Appellant admitted that he told Detective Moschetto a number of lies about the gun before ultimately telling Detective Moschetto that the gun belonged to him.

On March 20, 2009, appellant went back to the law enforcement center. Appellant saw Hale at that time. Appellant said that he knew Hale had been talking with police officers about the shooting at his house. Appellant testified that he did not tell the police officers that Hale and Alcala had shot at Guinan and him.

Frank M. Smith III testified as an expert witness for the defense. He said that he was a certified peace officer and a gunsmith for major firearm manufacturers. Smith had examined Guinan's 2001 Chevrolet Cavalier. Based on that examination, Smith concluded that there had been a bullet strike on the left rear door of the car. Smith testified that the bullet did not penetrate the metal of the car door but, instead, ricocheted off the door. Smith said that there was no way to determine when the bullet strike occurred.

6

Appellant called his mother, Cheryl Freeman, as a witness.  She testified that she became aware that appellant had been involved in the March 4, 2009 shooting incident the night of the incident.  The State then took Cheryl on voir dire.  During questioning by the prosecutor, Cheryl said that any information she knew about the incident had come from what appellant and Guinan told her about it.  The State then objected to any testimony by Cheryl about the incident on hearsay grounds.  Appellant's counsel then stated as follows:

> It's not being offered for the truth of the matter asserted, Judge.  The purpose and it[s] sole purpose is to refute the State inviting the jury to believe that this is recent fabrication.  And if he told the same or similar story on the night in question, it is rebuttal to the State's theory of recent fabrication, and I think she's entitled to testify to it, and it's not being offered for the truth of the matter asserted.

The trial court sustained the State's objection.  At the request of appellant's counsel, the trial court held a hearing outside the presence of the jury.  During the hearing, Cheryl testified that appellant called her on the night of the incident.  Cheryl said that appellant was really scared.  According to Cheryl, appellant told her that "[Hale] and them" threw bricks and shot at Guinan and him.  Appellant also told Cheryl that he shot back when nobody was around.  Cheryl testified that she told appellant that he needed to report the incident to the police.  Appellant responded, "Mom, let's just forget it because maybe it will just die down and, you know, nothing else will happen."  Following Cheryl's testimony, the trial court again ruled that her testimony was inadmissible.

During the guilt/innocence phase, appellant called Samuel David Brinkman, Ph.D. as an expert witness.  Dr. Brinkman is a neuropsychologist.  The State objected to any testimony by Dr. Brinkman.  At the State's request, the trial court held a hearing on the State's objection outside the presence of the jury.  Appellant's counsel stated the following:

> Judge, the reason I want to call Dr. Brinkman is to show the mental state of my client, which could explain to the jury many factors that they need to consider in determining whether he's guilty or not guilty.  One of those factors would be the issue of if a man is shot at once or twice and a brick thrown upon his car, why he would return back to subject himself again.  This is not normal behavior.  This is not normal human behavior, and Dr. Brinkman would help to explain that to the jury.

7

The prosecutor then responded as follows:

> Your Honor, what he's asking for is some kind of impulse control issue, which Texas does not recognize. He's testified it was a voluntary act, which is required, and there's no issue of competence or insanity in this case.

The trial court sustained the State's objection to Dr. Brinkman's testimony. Appellant's counsel then offered a report from Dr. Brinkman as an exhibit for the appellate record. Appellant's counsel stated that "Dr. Brinkman would most likely testify to what he put in his written report, and that would be our proffer so that the appellate court can determine if these issues were admissible." The State had no objection to the request that the report be included in the record, and the report is included in the record. Dr. Brinkman testified before the jury during the punishment phase of the trial.

*Standard of Review*

Appellant complains of evidentiary error in both of his points of error. We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006); *Burden v. State*, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001). An appellate court will not reverse a trial court's ruling unless that ruling falls outside the zone of reasonable disagreement. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Burden*, 55 S.W.3d at 615.

*Evidence of Appellant's Mental State and Capacity*

In his first point, appellant contends that the trial court erred by excluding Dr. Brinkman's testimony about appellant's mental state and capacity. The indictment alleged that appellant intentionally and knowingly threatened Hale with imminent bodily injury by the use of a handgun. Aggravated assault by threat is a "nature of conduct" offense that has no required result. *Landrian v. State*, 268 S.W.3d 532, 536–37 (Tex. Crim. App. 2008); *Johnson v. State*, 271 S.W.3d 756, 761 (Tex. App.—Waco 2008, pet. ref'd); *Dolkart v. State*, 197 S.W.3d 887, 893 (Tex. App.—Dallas 2006, pet. ref'd). Section 6.03 of the Penal Code defines intentionally and knowingly, in relevant part, as follows:

> (a) A person acts intentionally, or with intent, with respect to the nature of his conduct . . . when it is his conscious objective or desire to engage in the conduct.

> (b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.

TEX. PENAL CODE ANN. § 6.03(a), (b) (West 2011). Appellant asserts that, through Dr. Brinkman, he sought to introduce evidence about "his mental state, cognitive abilities, low mental functioning, poor executive function and perceptive abilities." Appellant contends that this evidence was relevant to the issue of whether he had the "ability to know . . . the nature of his conduct" and, therefore, was admissible to show that he did not have the ability to form the culpable mental state – engaging in intentional or knowing conduct – for committing the charged offense.

Dr. Brinkman evaluated appellant for the purpose of determining his competency to stand trial. Following that evaluation, Dr. Brinkman concluded that appellant was competent to stand trial. Dr. Brinkman prepared a report in connection with his evaluation. After the trial court excluded Dr. Brinkman's testimony, appellant introduced a copy of the report into the record for appellate purposes. Dr. Brinkman stated in the report that appellant's medical records indicated that he had "a long history of behavioral and emotional control issues (especially anger control)." In the summary and conclusions section of the report, Dr. Brinkman stated that appellant "demonstrated borderline intellectual functioning"; that appellant's "[l]anguage and communication skills were somewhat below normal but functional"; that appellant "demonstrated marked disturbance of attentional processes and there was evidence of executive dysfunction as well"; that appellant "has a long history of poor coping skills, with angry outbursts, behavioral acting out, poor insight, and very limited tendency to learn from experiences"; that appellant's "poor coping abilities probably reflect the very difficult early childhood experiences (abuse by father and stepmother); and that "[t]here has been no evidence of psychosis." Dr. Brinkman diagnosed appellant with "ADHD, combined type"; "Bipolar disorder NOS"; "Post-traumatic stress disorder, chronic"; "History of alcohol, marijuana, and other substance abuse"; "Personality disorder NOS with antisocial trends"; and "Multiple concussions in past."

Appellant did not raise insanity as an affirmative defense. There is no affirmative defense of "diminished capacity" in Texas, other than insanity. *Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008); *Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005).

However, diminished capacity is recognized as a simple "failure-of-proof defense in which the defendant claims that the State failed to prove that the defendant had the required state of mind at the time of the offense." *Jackson*, 160 S.W.3d at 573. As with other elements of the offense, the defendant may present relevant evidence negating the requisite mens rea. *Ruffin*, 270 S.W.3d at 594; *Jackson*, 160 S.W.3d at 574. This evidence may include evidence of a defendant's history of mental illness or evidence of a defendant's physical or mental diseases or defects. *Ruffin*, 270 S.W.3d at 593–94; *Jackson*, 160 S.W.3d at 574. But the evidence still must meet generally applicable requirements for admission of evidence, and it may be excluded at the guilt/innocence stage if it does not truly negate the required mens rea. *Mays v. State*, 318 S.W.3d 368, 381–82 (Tex. Crim. App. 2010); *Ruffin*, 270 S.W.3d at 595–96.

*Ruffin* illustrates when evidence of mental disease or defect is admissible. In that case, the defendant was charged with multiple first-degree felony offenses of aggravated assault of a public servant after he fired several shots at police officers. *Ruffin*, 270 S.W.3d at 587. The mens rea element of the charged offenses was that appellant intended to shoot at the police officers. *Id.* at 594. The defendant and other lay witnesses testified that the defendant suffered from delusions. *Id.* at 596–97. The defendant said that he believed he was shooting at a "trespasser" and "hundreds of Muslims" instead of police officers. *Id.* at 590. The trial court excluded expert testimony from the defendant's psychologist relating to the existence and severity of the defendant's mental disease and delusions, and the court of appeals held that the trial court did not abuse its discretion by excluding the testimony. *Id.* at 587. The court of criminal appeals held that the expert testimony was relevant to rebut the mens rea element of the offense that the defendant intended to shoot at police officers. *Id.* at 596–97. The court explained as follows:

> If . . . the defendant suffers from mental delusions such that he sees a "trespasser" or a "Muslim" when everyone else around him sees a police officer, he cannot be convicted of intentionally shooting at a police officer, although he may be convicted of intentionally shooting at a trespasser or Muslim. Guilt of the greater offense requires that the State prove, beyond a reasonable doubt, that the defendant intended to shoot a police officer, not a trespasser or Muslim.

*Id.* at 594. Thus, in *Ruffin*, the psychologist's testimony, if believed, would have lessened the offenses from first-degree aggravated assaults of police officers to second-degree aggravated assaults (an intentional shooting at a "trespasser" or at "Muslims"). *Id.* at 594; *see Mays*, 318

S.W.3d at 381. That testimony negated the required mens rea for the offenses of aggravated assaults of police officers.

This case is distinguishable from *Ruffin*. Appellant and Guinan both testified that nobody was present when appellant fired the shots. Appellant does not contend he was suffering from a mental defect or delusion that caused him to fire the shots or to think that Hale was not present when Hale actually was present. Dr. Brinkman's report makes no mention of delusions. Dr. Brinkman's report indicates that appellant had limitations in cognitive ability and mental functioning. However, nothing in Dr. Brinkman's report suggests that appellant did not have the ability to form or did not form the culpable mens rea for committing the offense. Assuming that Dr. Brinkman's testimony would be consistent with what he stated in his report, that testimony, if believed, would not negate the required mens rea for the offense. Therefore, we conclude that the trial court did not abuse its discretion in excluding it. *Mays*, 318 S.W.3d at 382; *Ruffin*, 270 S.W.3d at 596. Appellant's first point of error is overruled.

*Evidence of Prior Consistent Statement*

In his second point, appellant contends that the trial court erred by excluding evidence of a prior consistent statement that he made to his mother, Cheryl, on the night of the incident. The trial court sustained the State's hearsay objection to Cheryl's testimony. Therefore, the trial court excluded testimony by Cheryl that appellant told her that "[Hale] and them" shot at Guinan and him before he fired the shots and that nobody was present when he shot back. Appellant contends that evidence of his prior consistent statement was admissible because it was offered to rebut the State's implied charge against him of recent fabrication of the testimony that Hale and Alcala shot at him.

Rule 801(e)(1)(B) of the Rules of Evidence gives substantive, non-hearsay status to prior consistent statements of a witness that are offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. TEX. R. EVID. 801(e)(1)(B); *Hammons v. State*, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007). To be admissible, a prior consistent statement must be made before the motive to fabricate arose. *Hammons*, 239 S.W.3d at 804; *Dowthitt v. State*, 931 S.W.2d 244, 263 (Tex. Crim. App. 1996); *Haughton v. State*, 805 S.W.2d 405, 408 (Tex. Crim. App. 1990). In this case, appellant had a motive to lie about the incident as soon as he shot his gun at Hale's Explorer. Appellant knew that he could get into trouble for shooting out the windows of the Explorer and, therefore, had a motive to lie about the

extent of his involvement in the incident and being shot at by Hale and Alcala.  Because appellant had the same motive to lie at the time of his statement to his mother as he did during his testimony at trial, his statement to his mother on the night of the incident was not admissible to rebut a charge of recent fabrication.  *Hammons*, 239 S.W.3d at 804.  Therefore, the trial court did not abuse its discretion by excluding Cheryl's testimony.  Appellant's second point of error is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.


TERRY McCALL

JUSTICE


February 9, 2012

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.

12