# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-18-00248-CR[1]

**Carlos Whitcomb, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT NO. D-1-DC-16-904034, THE HONORABLE DAVID CRAIN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Carlos Whitcomb guilty of murdering his mother and stepfather, *see* Tex. Penal Code § 19.02(b)(1), and assessed his punishment at confinement for 25 years in the Texas Department of Criminal Justice for each murder, *see id.* §§ 12.32, 19.02(c). In a single point of error, appellant challenges the jury's rejection of his insanity defense. We find no reversible error. However, we have found non-reversible errors in the written judgments of conviction. We will modify the judgments to correct the clerical errors and, as modified, affirm the trial court's judgments of conviction.

---

[1] The notice of appeal in this case was originally filed in this Court on July 14, 2016. This Court transferred the case to the Eighth Court of Appeals on August 9, 2016, in compliance with an order of the Supreme Court of Texas issued pursuant to its docket equalization authority. *See* Tex. Gov't Code § 73.001; Misc. Docket No. 16-9100 (Tex. June 21, 2016) (per curiam). On April 12, 2018, the Supreme Court of Texas ordered that this case, along with certain other cases, be transferred back to this Court from the Eighth Court, and we consider this appeal pursuant to that order. *See* Misc. Docket No. 18-9054 (Tex. Apr. 12, 2018) (per curiam).

## BACKGROUND[2]

Appellant was employed as a respiratory therapist until he lost his job because he tested positive for marijuana. After he lost his job, he moved in with his parents: his mother, Phyllis Payne, and his stepfather, Kenneth Payne. Two years later, appellant had not regained employment and was still living with his parents. Then, on the morning of May 24, 2013, at approximately 11:00 a.m., emergency medical services were called out to a location by a creek near the house where appellant lived with his parents.

Emergency medical technician Bryan Monterroso made contact with appellant, who provided his name but had no form of identification on him. The EMT observed that appellant had "a very sullen disposition," his clothes were wet and muddy, and he was shivering. Appellant reported to Monterroso that he had been fishing and had fallen into the creek and floated to where the first responders found him.[3] Although appellant's behavior was "a little bit erratic" and his communication was "a little disjointed," appellant was responsive to Monterroso's questioning. Monterroso assessed appellant—his visual functioning, mental functioning, and motor functioning—and rated him a 15 on the Glasgow Coma Scale, which, according to the EMT, ruled out any traumatic brain injuries. Appellant had minor physical injuries: a small abrasion on the left side of his forehead and various scratches with bruising on his forearms. However, because of appellant's behavior and his lack of identification, the decision was made to transport appellant to

---

[2] The facts recited in this opinion are taken from the testimony and exhibits admitted at trial.

[3] During the interaction, appellant mentioned fishing with "Big John" and suggested that someone with a rifle had kept him from getting out of the creek. However, the first responders saw no other individuals in the area.

2

the hospital "where he could receive a more comprehensive level of care." During transport, appellant commented that "he couldn't return to his parents' home because they had been murdered."

At the hospital, appellant called his sister, Misty Anderson, at her work. According to Misty, appellant said he was in the hospital and was trying to get a hold of their mother. He asked Misty to call their mother to let her know that he was in the hospital. Appellant also expressed that he was happy to hear Misty's voice because he had had "a really bad dream" where zombies were eating their parents and the neighbors and had pushed Misty down. Misty called her husband, Clint Anderson, who called the Paynes' neighbor and family friend, James Hendon, and asked him to check on Phyllis and Kenneth.[4] Hendon went to the Paynes' house and found them dead inside. Phyllis was in the living room on the floor behind the sofa; Kenneth was in the master bedroom on the floor next to the bed. Both had been shot multiple times. Hendon called Clint and then 911. Hendon expressed that he "knew it was [appellant]" who had killed Phyllis and Kenneth "because of his behavior the last couple months" before the shooting.[5]

Appellant was diagnosed with a subacute subdural hematoma and was admitted to the hospital. He underwent brain surgery to evacuate the hematoma on June 4, 2013, 11 days after he was admitted. The neurosurgeon who operated on appellant, Craig Kemper, explained that he waited to evacuate appellant's subdural hematoma—which the medical team felt was asymptomatic

---

[4] Misty testified that she had previously tried to reach her parents that morning because she and her husband had planned to leave town that afternoon and her parents were going to pet sit for them while they were gone. She had been unable to reach her parents or appellant.

[5] Hendon, who was 43 at the time of trial, testified that he met the Paynes when he was 19. He described Phyllis as "a mother figure" to him, Kenneth as "like a dad" to him, Misty as "like a sister," and appellant as "like a brother." In his testimony, Hendon revealed that he moved to Fort Worth after this incident "[b]ecause [he] couldn't drive down that road again."

3

(meaning it caused no overt symptoms)—to ensure appellant's competency to consent to the treatment, which was confirmed by a psychiatric evaluation, and to try to improve appellant's blood clotting issues, which made the surgery riskier.

While appellant was in the hospital awaiting surgery, Alan Howard, a detective with the Travis County Sheriff's Office, interviewed appellant on May 28, 2013. An audio recording of the interview was admitted into evidence. At trial, the detective acknowledged that some of the things that appellant said were "pretty bizarre"—including the fact that he said that his parents had visited him in the hospital—but noted that appellant "remembered certain details consistent with the facts of the case." During the interview, appellant initially expressed that he thought the murder of his parents was a dream. Next, appellant indicated that three men had broken into his home and shot his parents with his guns, though appellant was unable to explain how the intruders obtained his firearms, which he kept stored under his bed. Ultimately, appellant described shooting his parents—providing accurate details about where they were in the house when he shot them, where on their bodies he shot them, the order in which he shot them, how many times he shot them, and what weapons he used to shoot them.

Appellant told the detective that after shooting his parents, he left in his Jeep.[6] When Detective Howard asked where the Jeep was, appellant said that he parked it by a particular bridge. However, deputies did not find appellant's Jeep at that location. Further, they were unable to locate it despite searching the area by helicopter. The Jeep was finally recovered more than four months

---

[6] In the version where he said that intruders shot his parents, appellant said that the men forced him to drive off in the Jeep with them.

4

after the murders parked in a stand of trees in a wooded area approximately two and a half miles from the bridge that appellant named.[7] The Ruger .45 handgun that appellant used in the murders was hidden in the weeds nearby. The SKS assault rifle that he used in the murders was in the back of the Jeep with appellant's shotgun. Appellant's wallet with his ID was recovered on the ground outside the Jeep.

The State charged appellant with the murder of his parents. The first paragraph of the indictment alleged that appellant intentionally or knowingly caused the death of his stepfather by shooting him with a firearm; the second paragraph alleged that appellant intentionally or knowingly caused the death of his mother by shooting her with a firearm. *See* Tex. Penal Code § 19.02(b)(1). At trial, in the jury charge, the trial court instructed the jury on the affirmative defense of insanity. The jury found appellant guilty as charged in the indictment and subsequently assessed his punishment at 25 years in prison for each murder.

## DISCUSSION

Appellant does not dispute that sometime during the night of May 23, 2013 or early morning hours of May 24, 2014, he shot both his mother and stepfather multiple times, first with his handgun and then with his assault rifle, causing their deaths. There was no evidence at trial suggesting that appellant had a history of violent behavior. Accordingly, appellant maintained that his "out of character" conduct of murdering his parents was the result of insanity. In his sole point of error, appellant challenges the jury's rejection of his insanity defense because, according to

---

[7] The Jeep was discovered by the property owner who was riding his horse on the property and saw the Jeep behind the trees.

appellant, he met his burden of proof to show that he was insane at the time of the offenses, and the State did not meet its burden of rebutting the defense.

**Insanity Defense**

A criminal defendant is presumed to be sane and to intend the natural consequences of his acts absent proof by a preponderance of the evidence that he is insane. *Ruffin v. State*, 270 S.W.3d 586, 591–92 (Tex. Crim. App. 2008); *Martinez v. State*, 867 S.W.2d 30, 33 (Tex. Crim. App. 1993). It is an affirmative defense to prosecution that, at the time of the charged conduct, the defendant did not know that his conduct was wrong as a result of a severe mental disease or defect. Tex. Penal Code § 8.01(a). The test for determining insanity is whether the defendant, at the time he committed the offense, did not know that his conduct was wrong due to a severe mental disease or defect. *Ruffin*, 270 S.W.3d at 592; *see* Tex. Penal Code § 8.01(a). The insanity defense focuses on whether the accused understood the nature of his action and whether he knew he should not do it. *Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994); *see Ruffin*, 270 S.W.3d at 592 (noting that "wrong" in insanity context means "illegal"). The defendant has the burden to prove an affirmative defense, such as insanity, by a preponderance of the evidence. *See* Tex. Penal Code § 2.04(d).

Criminal defendants may raise a factual sufficiency challenge to a jury's adverse finding on an affirmative defense, including an insanity defense. *Matlock v. State*, 392 S.W.3d 662, 670 (Tex. Crim. App. 2013). When asserting a factual sufficiency challenge, a defendant is arguing that considering the entire body of evidence, the jury's adverse finding on his affirmative defense

6

was so against the great weight and preponderance of the evidence as to be manifestly unjust.[8] *Id.* at 671. When conducting a factual sufficiency review of a rejected affirmative defense, an appellate court must view the entirety of the evidence in a neutral light without usurping the jury's function to assess the weight and credibility of the witnesses' testimony by substituting its own judgment. *Id.* Where the parties present conflicting evidence on the issue of insanity, determinations regarding the weight and credibility of that evidence should be resolved by the finder of fact, and the reviewing court should defer to those decisions because the finder of fact had the benefit of observing the witnesses' actions and demeanor. *Reyes v. State*, 480 S.W.3d 70, 73 (Tex. App.—Fort Worth 2015, pet. ref'd); *Lantrip v. State*, 336 S.W.3d 343, 348 (Tex. App.—Texarkana 2011, no pet.); *see Bigby*, 892 S.W.2d at 878 ("Ultimately, whether the defense of insanity was proved is a decision that lies within the province of the trier of fact, not only as to the credibility of witnesses and the weight of the evidence, but also as to the limits of the defense." (quoting *Graham v. State*, 566 S.W.2d 941, 952 (Tex. Crim. App. 1978))). An appellate court may sustain an appellant's factual insufficiency claim only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Matlock*, 392 S.W.3d at 671.

---

[8] The argument is that the defendant has offered so much evidence in support of his affirmative defense and that the State has offered so little evidence rebutting his defense that the jury's rejection of his affirmative defense is against the great weight and preponderance of the evidence. *Matlock v. State*, 392 S.W.3d 662, 670 n.29 (Tex. Crim. App. 2013). Put another way, the defendant claims that his evidence is more than sufficient to support his affirmative defense while the State's evidence is insufficient to rebut it. *Id.*

The undisputed evidence at trial established that after appellant was transported to the hospital on May 24th, he was diagnosed with a subdural hematoma. What was disputed at trial was the cause of the brain bleed and its effect on appellant. Appellant maintained that the hematoma resulted from a fall several days before the murders. Testimony from appellant's primary care physician, Sarah Daniels, reflected that she saw appellant on May 21, 2013. At that visit, appellant complained of nausea and stomach upset, reporting to Dr. Daniels that he had fainted and fallen in Costco a few days before the visit. Dr. Daniels recommended that appellant go to the emergency room for further testing, but appellant declined to go.

Appellant presented testimony from a neuropsychologist, William Dailey, and a forensic psychiatrist, Maureen Burrows, who both believed that appellant's subdural hematoma resulted from his fall in Costco. Dr. Dailey opined that the subdural hematoma caused brain displacement and compression, which caused appellant to develop a misidentification syndrome called "Capgras Syndrome." He indicated that in appellant's case, Capgras Syndrome was "sort of imbedded in a more broad delusional, confusional state just resulting from the nature of this injury and brain compression and other stuff that is going on with it." Dr. Dailey explained that Capgras Syndrome is a delusional disorder where an individual perceives people close to him as evil imposters rather than their loved ones. He said that, though Capgras Syndrome is "an uncommon problem," "there are cases in the literature that describe individuals who have this problem who become aggressive and kill all their family members." According to Dr. Dailey, appellant killed his parents because he misidentified them as evil imposters.

Dr. Burrows explained that she consulted Dr. Dailey because appellant's case "bugged [her]" and "didn't make sense" to her. She felt that she needed a specialist to help her understand what appellant's brain injury—"the only thing that seemed different to [her]"—meant in this case. She explained that, to her, Capgras Syndrome explained "why [appellant] got so angry" as well as his "disconnect from what actually happened." Dr. Burrows opined that appellant's subdural hematoma caused psychosis, which included the delusional aspect of Capgras Syndrome. She expressed her belief that because of the psychosis, "whatever happened he didn't know what was going on and that it was wrong." Accordingly, Dr. Burrows concluded that appellant was insane at the time of the offenses.

However, there was evidence at trial that contradicted the defense experts' opinions. First, appellant's experts opined that appellant's brain injury was caused by his fall at Costco, which the evidence indicated occurred on May 18th. However, the State presented the testimony of Craig Kemper, the neurosurgeon who operated on appellant. Dr. Kemper testified that appellant's hematoma was two to three weeks old at the time he was admitted to the hospital on May 24th, which would mean that the hematoma developed one to two weeks before appellant's fall at Costco. Furthermore, appellant's sister, Misty, and the family friend, Hendon, both testified that appellant's odd behavior started before his fall. Hendon stated that appellant started exhibiting odd behavior after he moved back in with his parents, but particularly during the two months before the murders. Hendon explained that appellant would bring up random unrelated topics during conversations. He

9

also described appellant slumping over his food during dinner, staring at it instead of eating it.[9] Misty said that she noticed her brother's bizarre behavior well before the murders and his fall at Costco. She testified that he started "acting weird"—which she described as having memory problems, being lethargic, and being "childlike"—a year and a half to two years before he killed their parents, which was about the time that appellant moved in with his parents or shortly thereafter.

Further, to support his opinion that appellant suffered from Capgras syndrome, an extremely rare condition that neither defense expert had personal experience with, Dr. Dailey focused on appellant's reference to zombies (when appellant described the bad dream in which zombies killed his parents and pushed Misty down) and suggested that a zombie "is the perfect embodiment of this problem" (Capgras Syndrome) because a zombie is someone whose former self has been "replaced" with another evil force, "which is how people with Capgras Syndrome perceive people they're very attached to." However, appellant's reference to zombies was that zombies had killed his parents, not that he had killed the zombies—that is, the zombies were the perpetrators of the murders, not the victims. Moreover, as Dr. Dailey acknowledged, appellant's comments after the murders did not reflect misidentification of his parents—he told EMT Monterroso that his parents had been murdered; he described to Detective Howard how he shot each of his parents. Furthermore, Dr. Dailey never testified that a person with Capgras Syndrome does not know or understand that it is wrong to kill. Dr. Dailey never opined that appellant did not know that his conduct was wrong because he suffered from the delusions associated with Capgras Syndrome.

---

[9] Hendon testified that he was at the Paynes' house three or four nights a week and had dinner with them often.

Support for that aspect of appellant's insanity defense—that appellant did not know that killing his parents was wrong—came from Dr. Burrows's testimony.

Dr. Burrows expressed that, when assessing whether a person knows that their conduct was wrong, she looks at whether there is "a rational motive" for the conduct: "[i]f there is no rational motive, something has to explain it."  Because she could not discern a rationale motive for appellant murdering his parents and because appellant exhibited delusional behavior, Dr. Burrows maintained that some sort of psychosis explained appellant's conduct.  However, while Dr. Burrows maintained that appellant suffered from psychosis, Dr. Daniels testified that appellant did not exhibit psychotic behavior during the clinic visit on May 21st or a subsequent visit on May 23rd.  Moreover, the insanity defense focuses on whether the accused understood the nature of his action and whether he knew he should not do it.  *Ruffin*, 270 S.W.3d at 592 & n.17; *Bigby*, 892 S.W.2d at 877–78.  Whether a motive—rational or otherwise—can be ascertained is not the standard for determining insanity.  Indeed, acts of violence are often senseless, hard to comprehend, and seemingly without reason or motive.

In addition to seeking a rational motive, to determine whether appellant knew his conduct was wrong, Dr. Burrows examined appellant's conduct after the murder.  She interpreted appellant's conduct after the murders—she asserted that appellant did not flee the area, did not dispose of his Jeep, left the murder weapons in the home, and gave his correct name to first responders—as indications that appellant did not know that his conduct was wrong.[10]  She did not

_____

[10] Notably, one of the facts Dr. Burrows relied on as indicating that appellant did not know that killing his parents was wrong was the fact that appellant left the murder weapons in the house when he left.  However, as the prosecutor pointed out to her, she was mistaken about that fact.

11

consider his actions—fleeing the murder scene, removing the murder weapons from the scene, and hiding his Jeep miles away—to be showing "a high level" of hiding evidence that would indicate that he knew his conduct was wrong.

To rebut the defense experts, the State presented evidence that appellant's subdural hematoma was caused by appellant's severe alcohol dependence. The State presented the testimony of Michael Arambula, a forensic psychiatrist with a Ph.D. in Pharmacy, who opined that appellant suffered from a severe case of alcohol dependence. He explained that appellant's medical records, particularly the lab results related to liver dysfunction, demonstrated high levels of alcohol use and a pattern of alcohol dependence. Dr. Arambula further explained that visual hallucinations and blood clotting abnormalities—both of which appellant experienced—are typical in severe cases of alcohol dependence.[11] He also noted that seizures are not unusual with people who have a serious alcohol problem.[12] Dr. Arambula concluded that appellant's subdural hematoma was alcohol related

---

Appellant took the guns he used in the murders with him when he left the scene, though he left the remainder of his gun collection there. The correction of that fact did not impact Dr. Burrows's opinion. Nor did she consider appellant hiding his Jeep behind trees, hidden from the roadway, two and a half miles away from where he told the police it was located, to be an attempt to dispose of or hide evidence, notwithstanding the fact that it took police four months to locate the Jeep, and found it only when, by happenstance, the property owner came across it unexpectedly.

[11] Dr. Arambula interviewed appellant after appellant had been charged with his parents' murders. In that interview, appellant referred to the intruders into his home as "shadows." Dr. Arambula characterized this description as a visual hallucination or illusion.

The medical records and testimony of the various medical experts reflected that appellant had blood clotting issues, which was one of the reasons appellant's brain surgery was delayed.

[12] Dr. Daniels testified that although appellant refused to go to the hospital for further testing on his May 21st visit, he did agree to return for a follow-up visit. He returned two days later on May 23rd. At that visit, appellant had an inflamed tongue because he had bitten it during his sleep. Dr. Daniels was concerned that appellant might have had a seizure. Throughout her testimony,

12

as chronic subdural hematomas often occur in people involved in the cycle of alcohol dependence, which involves the repeated use of alcohol followed by periods of withdrawal.

Appellant notes in his brief that both Misty and Hendon indicated that they had not seen appellant intoxicated. However, contrary to appellant's contention, Dr. Arambula did not opine that appellant was intoxicated at the time of the offense. Rather, his testimony related to appellant's severe alcohol dependence, which he said was indicated by appellant's medical records, and its impact on appellant—namely, appellant's subdural hematoma, blood clotting issues, and confused and delusional behavior. Dr. Arambula, who had experience treating a patient with Capgras Syndrome, did not agree that appellant suffered from Capgras Syndrome. He concluded that appellant did not have a severe mental illness. Thus, notwithstanding appellant's odd behavior, Dr. Arambula opined that appellant was legally sane at the time of the offenses.

The testimony of Dr. Kemper, who considered the subdural hematoma to be asymptomatic, also refuted the defense experts' opinions. As noted previously, Dr. Kemper opined that appellant's hematoma was two to three weeks old at the time he was admitted on May 24th, which indicated that it did not result from the Costco fall. Furthermore, the neurosurgeon also testified that subdural hematomas are more common in patients with high levels of alcohol consumption, corroborating Dr. Arambula's testimony that chronic subacute subdural hematomas often occur in people with an alcohol dependence problem.

Furthermore, in her evaluation of appellant, Dr. Burrows diagnosed appellant with an alcohol use disorder. She agreed that appellant's lab changes were "likely due to alcohol" but

---

Dr. Daniels expressed her belief that appellant had a problem with alcohol.

13

noted that "nobody ha[d] committed to calling him an alcoholic." She conceded that "there are instances with alcohol where you can have delusional or psychotic behavior" but expressed that "that's in a withdrawal scenario." She also acknowledged that hallucinations are common in alcohol withdrawal. Nevertheless, Dr. Burrows discounted the evidence of appellant's alcohol dependence as a factor impacting his conduct. Yet, such a "withdrawal scenario" was precisely what Dr. Arambula described in his testimony. He explained that appellant's medical records, particularly the lab work relating to liver functioning, demonstrated high levels of alcohol use as far back as 2010, and that severe alcohol dependence resulted in repeated cycles of use and withdrawal, which explained appellant's behavior and symptoms, including the subdural hematoma. Appellant's medical records from the hospital—which revealed that appellant's medical providers were concerned about appellant's alcohol abuse and that appellant was being monitored for alcohol withdrawal symptoms—corroborated Dr. Arambula's conclusion that appellant's subdural hematoma resulted from his severe alcohol dependence.

Appellant argues that only his defense experts "were able to point to an undisputed fact issue [appellant's subdural hematoma] as the reason for appellant's out-of-character behavior." *See Bigby*, 892 S.W.2d at 878 ("Before [the jury's] decision [on insanity] may be overturned on appeal, the fact issue must be undisputed or resolved to one end of the spectrum, *and* that fact determination must be found to lie outside the realm of discretion accorded the jury under the applicable standard." (quoting *Graham*, 566 S.W.2d at 952 n.3)). However, while it is true that all of the experts agreed that appellant had a subdural hematoma at the time of the murders, there was

14

a difference in opinion as to what caused that hematoma and whether it impacted appellant's behavior and his understanding that his conduct was wrong at the time he murdered his parents.

The issue of insanity is not strictly medical; it also invokes both legal and ethical considerations. *Bigby*, 892 S.W.2d at 877; *see Graham*, 566 S.W.2d at 948–49. In deciding the ultimate issue of sanity, only the jury can join the non-medical components that must be considered in deciding the ultimate issue. *Id.* at 878; *see Schuessler v. State*, 719 S.W.2d 320, 329 (Tex. Crim. App. 1986), *overruled on other grounds by Meraz v. State*, 785 S.W.2d 146 (Tex. Crim. App. 1990) ("[W]hen testimony conflicts on the issue of insanity, the trier of fact is the sole judge of the weight and credibility to be given to the evidence."). Here, the jury was presented with: evidence of appellant's behavior, symptoms, and conduct before, during, and after the murders; differing opinions about what accounted for his behavior, symptoms, and conduct; and contradicting opinions about whether appellant suffered from a severe mental illness that caused him to not know that shooting his parents to death was wrong. It was for the jury to hear the evidence and determine whether appellant was legally insane. *See Bigby*, 892 S.W.2d at 878; *Graham*, 566 S.W.2d at 952; *Allen v. State*, 232 S.W.3d 776, 778 (Tex. App.—Texarkana 2007, no pet.); *Elliott v. State*, No. 03-03-00191-CR, 2005 WL 850283, at *7 (Tex. App.—Austin Apr. 14, 2005, no pet.) (mem. op., not designated for publication). On this record, the jury reasonably could have resolved the conflicting evidence regarding legal insanity against appellant. We will not second-guess the jury's determinations on matters of credibility or weight to be given witness testimony. *See Matlock*, 392 S.W.3d at 671; *Bartel v. State*, No. 02-16-00020-CR, 2017 WL 1089689, at *4 (Tex. App.—Fort Worth Mar. 23, 2017, no pet.) (mem. op., not designated for publication); *Elliott*,

15

2005 WL 850283, at *7; *Aschbacher v. State*, 61 S.W.3d 532, 537 (Tex. App.—San Antonio 2001, pet. ref'd).

Therefore, based upon the evidence presented at trial—recognizing that it was the jury's duty to evaluate the weight and credibility of the conflicting evidence—we hold that the jury's determination that appellant failed to prove insanity by a preponderance of the evidence is not so against the great weight and preponderance of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *See Matlock*, 392 S.W.3d at 671. The evidence is factually sufficient to support the jury's rejection of appellant's insanity defense. Accordingly, we overrule appellant's sole point of error.

**Error in the Written Judgments**

On review of the record, we observe that the written judgments of conviction in this case contain non-reversible clerical error. Each judgment states that the "Statute for Offense" is "19.02(c) Penal Code." This statutory provision establishes that the offense murder is a first degree felony. However, the applicable statutory provisions for the offense for which appellant was convicted also include section 19.02(b)(1) of the Penal Code, the statutory provision that defines the offense of murder as charged in this case—intentionally or knowingly causing the death of an individual.

This Court has authority to modify incorrect judgments when the necessary information is available to do so. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Accordingly, we modify the judgments of conviction to reflect that the "Statute for Offense" is "19.02(b)(1), (c) Penal Code."

16

**CONCLUSION**

Having concluded that the evidence is factually sufficient to support the jury's rejection of appellant's insanity defense, we modify the trial court's judgments of conviction as noted above and affirm the judgments as modified.

_____

Cindy Olson Bourland, Justice

Before Justices Puryear, Pemberton, and Bourland

Modified and, as Modified, Affirmed

Filed:   July 31, 2018

Do Not Publish